v.

**The NEW YORK CITY DEPART-MENT OF EDUCATION, Defendant.**

**No. 12 Civ. 05235(AJN).**

United States District Court, S.D. New York.

July 22, 2013.

Lauren A. Baum, Lauren A. Baum, P.C., New York, NY, for Plaintiffs.

Carolyn Elizabeth Kruk, NYC Law Department, New York, NY, for Defendants.

## ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs, P.G. and D.G. ("the Parents"), individually and on behalf of their minor child, J.G., bring this action pursuant to the Individuals with Disabilities Education Improvement Act against Defendant New York City Department of Education ("DOE"). Plaintiffs seek review of the April 6, 2012 administrative decision of State Review Officer ("SRO") Justyn P. Bates, which concluded that the DOE had provided J.G. with an adequate individualized education program, and reversed the prior decision of a state Impartial Hearing Officer ("IHO") who had found otherwise. Because Plaintiffs assert that the DOE failed to provide a fair and appropriate public education for their child, they seek reimbursement for the cost of his enrollment in the Eagle Hill School ("Eagle Hill"), a "non-profit" private school in which they unilaterally opted to enroll J.G.

for the 2010–2011 academic year. The parties have filed cross motions for summary judgment. For the reasons that follow, Plaintiffs' motion is DENIED in part and Defendant's motion is GRANTED in part, and the matter is REMANDED in part to the SRO for further consideration of the record.

## I. STANDARD AND STATUTORY BACKGROUND

### A. Background on the IDEA

■ The Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400 *et seq.*—the most recent iteration of the Individuals with Disabilities Education Act ("IDEA")—provides federal funds to states that provide a free appropriate public education ("FAPE") to all children with disabilities. 20 U.S.C. § 1412(a)(1)(A). "The ['FAPE'] mandated by federal law must include 'special education and related services' tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Special education services are administered pursuant to an individualized education program ("IEP"), or "a written statement for each child with a disability," that sets out the child's educational performance and goals and the services that will be provided to enable the child to meet those goals. 20 U.S.C. § 1414(d)(1)(A); *Schaffer v. Weast*, 546 U.S. 49, 53, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). The IEP is to be developed collaboratively by the child's parents, educators and representatives of the local education authority (including at least one special education teacher), among others. 20 U.S.C. § 1414(d)(1)(B); *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195,

197 (2d Cir.2002) (citing *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). A new IEP must be implemented each year. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir.2007).

■ While the IDEA "does not itself articulate any specific level of educational benefits that must be provided through an IEP," *Walczak*, 142 F.3d at 130, "the courts have developed standards to determine what the statute requires." *New York City Dep't of Educ. v. V.S.*, 2011 WL 3273922 (E.D.N.Y. July 29, 2011). To provide a FAPE, an IEP must "be sufficient to confer some educational benefit upon the handicapped child," but the statute does not require "the furnishing of every special service necessary to maximize each handicapped child's potential[.]" *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 199–200, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). "Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186 (2d Cir.2005) (quotation marks omitted).

### B. The IEP Process in New York

Though it does not set out substantive requirements, the IDEA "provides a variety of 'procedural safeguards with respect to the provision of a free appropriate public education' by school districts." *Mackey ex rel. Thomas M. v. Bd. of Educ.*, 386 F.3d 158, 160 (2d Cir.2004) (quoting 20 U.S.C. § 1415(a)), *supplemented*, 112 Fed. Appx. 89 (2d Cir.2004). "To meet these obligations and to implement its own policies regarding the education of disabled children, New York has assigned responsi-

bility for developing appropriate IEPs to local Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir.2007) (quotation marks and brackets omitted) (citing N.Y. Educ. Law § 4402(1)(b)(1)). Pursuant to New York regulatory law, a CSE developing a child's IEP is required to consider four factors: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Id.* (citing N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1(ww)(3)(i)).

Once an IEP is developed and proposed, a parent may challenge it before an IHO appointed by the local board of education. N.Y. Educ. Law § 4404(1); *see also* 20 U.S.C. § 1415(f) (setting forth requirements for impartial due process hearing and allowing state to determine whether hearing is conducted by state or local educational agency). Either the parent or the school board may appeal an adverse decision by the IHO to a State Review Officer ("SRO"). N.Y. Educ. Law § 4404(2); *see also* 20 U.S.C. § 1415(g) (requiring availability of appeal to state educational agency if initial due process hearing is conducted by local educational agency). As required by the IDEA, the SRO's decision may be challenged in either state or federal court. N.Y. Educ. Law § 4404(3); 20 U.S.C. § 1415(i)(2)(A).

▇▇▇ In addition, a dissatisfied parent may unilaterally place her child in a private school and seek reimbursement from the state for the expense of educating the child privately. *School Committee of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); 20 U.S.C. § 1412(a)(10)(C). "In determining whether the parents are entitled to reimbursement, the Supreme Court has

established a two part test: (1) was the IEP proposed by the school district inappropriate; [and] (2) was the private placement appropriate to the child's needs." *Gagliardo*, 489 F.3d at 111–12 (citing *Burlington*, 471 U.S. at 370, 105 S.Ct. 1996; *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 364 (2d Cir.2006), *cert. denied*, 552 U.S. 985, 128 S.Ct. 436, 169 L.Ed.2d 325 (2007)). A district court may also consider equitable factors in determining whether to order reimbursement for private placement. *Id.* at 112 (citing *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)). A parent who determines that a proposed IEP is unsatisfactory and unilaterally places her child in private school usually "do[es] so at [her] own financial risk," as a parent generally cannot obtain reimbursement for a private school placement if the courts ultimately determine that the proposed IEP was appropriate. *Burlington*, 471 U.S. at 373–74, 105 S.Ct. 1996.

### C. *Standard of Review*

▇▇▇ Although, as is typical in IDEA cases, the parties have submitted their papers in the form of summary judgment motions—filing competing "56.1 statements" along with their notices of motion—judges in this district have observed that "the procedure [in a federal IDEA appeal] is in substance an appeal from an administrative determination, not a summary judgment." *S.F. v. New York City Dep't of Educ.*, 2011 WL 5419847 (S.D.N.Y. Nov. 9, 2011) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir.2005)). "As such, summary judgment in IDEA cases often triggers more than an inquiry into possible disputed issues of fact." *Id.* Instead, the court conducts an "independent" review of the administrative record, basing its decision on the "preponderance of the evidence." *Bd. of Educ. of Hendrick Hud-*

son Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (citation omitted); see also Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ., 550 F.Supp.2d 420, 429 n. 10 (S.D.N.Y.2008) ("The inquiry ... is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed.").

■ Though the statute requires a "preponderance of the evidence" standard, 20 U.S.C. § 1415(i)(2)(C)(iii), the Second Circuit has observed that the analysis is complicated "by the fact that it occurs in the context of a complex statutory scheme involving institutional actors at different levels and within different branches of state and federal government." M.H. v. New York City Dep't of Educ., 685 F.3d 217, 244 (2d Cir.2012). In the Second Circuit, this analysis requires more than a "clear error" but less than a full de novo review. Id. Judicial deference to the administrative proceedings "is particularly appropriate when ... the state hearing officers' review has been thorough and careful." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir.1998). If "the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight." A.C. v. Board of Educ. of The Chappaqua Central School Dist., 553 F.3d 165, 171 (2d Cir.2009).

Importantly, "the district court's determination of the persuasiveness of an administrative finding must [ ] be colored by an acute awareness of institutional competence and role." M.H., 685 F.3d at 244 ("[T]he purpose of the IDEA is to provide funding to states so that they can provide a decent education for disabled students consistent with their traditional role in ed-

ucating their residents.") (emphasis in original). As a result, "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures" and "[d]ecisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress." Id.

## II. FACTUAL AND PROCEDURAL BACKGROUND

As is typical in IDEA cases, the Court's inquiry is "fact-intensive" and it is therefore "necessary to set forth in some detail the facts" presented in the record. R.E. v. New York City Dep't of Educ., 694 F.3d 167, 175 (2d Cir.2012). The following facts are undisputed except where noted.

Plaintiffs, P.G. and D.G., are parents who bring this action on behalf of themselves and their child, J.G. (Pl. 56.1 ¶ 1). J.G. has been diagnosed with Learning Disability, Not Otherwise Specified ("LD–NOS") and exhibits speech and language delays, in addition to difficulty with fine motor coordination, anxiety, cognitive inflexibility, social/emotional concerns, and low frustration· tolerance. (Pl. 56.1 ¶ 7–8; Def. 56.1 ¶ 7). However, the student's cognitive abilities are "overall" in the "average range." (Def. 56.1 ¶ 9).

P.G. asserts that J.G. was classified as having a disability in pre-school by the Committee on Pre-school Special Education ("CPSE") and began to receive services from the City at that time to address his deficits. (Tr. 818–19; Pl. 56.1 ¶ 3).

### A. The CSE Meeting

A CSE review meeting was held on April 26, 2010, to develop an IEP for J.G. for the 2010–2011 school year. ("April 26

Meeting") (Pl. 56.1 ¶ 13). The participants in the meeting included Feng Ye, a CSE special education teacher, who was also acting as the District representative; Rose Foschetta, the CSE psychologist; Carmen Garcia, a "parent member;" Victor Benavente, the CSE general education teacher; P.G., who is J.G.'s mother; Carol Courtadon, the parent advocate; and Alexis Williams, J.G.'s then-current special education teacher from the Aaron School, who appeared by phone. (Pl. 56.1 ¶ 14; Def. 56.1 ¶ 16). Foschetta testified before the IHO that everyone who was present at the meeting participated in J.G.'s IEP review. (Def. 56.1 ¶ 23).

Foschetta, Courtadon, and J.G.'s mother testified at the IHO hearing that, at the April 26 Meeting, there was no discussion regarding J.G.'s PDD–NOS diagnosis, and the CSE team appeared to rely solely upon its conversation with Ms. Williams and some of the parents' comments to draft the IPE. (Tr. 234–35, 760, 821). Courtadon testified that no psychological evaluation nor psycho-education evaluation was reviewed, discussed, or provided to the parent, Ms. Courtadon, or Ms. Williams during the course of the meeting. (Pl. 56.1 ¶ 18; Tr. at 201–04, 758–59, 822). Rose Foschetta testified that she did not have the 2007 psychological evaluation on the table at the CSE meeting, though she had "take[n] it in" beforehand. (Tr. 201–05; 821–22).

Courtadon and P.G. testified that the CSE team members read the 2009–2010 IEP quickly, and that it was difficult for Courtadon and the mother to keep track of and evaluate everything that the team members were saying, and to participate meaningfully in the meeting. (Pl. 56.1 ¶ 26). Nonetheless, neither Courtadon nor the Parent requested a copy of the draft

IEP that was being read so that they could review it themselves at their own pace. (Def. 56.1 ¶ 25).

Courtadon also testified that she believed that neither Ms. Ye nor Ms. Foschetta read the academic performance and learning characteristics page or the social/emotional performance page as they were written for the 2010–2011 IEP, and neither Ye nor Foschetta asked the mother if she agreed with those descriptions. (Pl. 56.1 ¶ 27). Courtadon further testified that the CSE team did not read to the mother, Ms. Williams, or Ms. Courtadon the actual academic goals that it was proposing for the 2010–2011 IEP. (Pl. 56.1 ¶ 28).

Courtadon testified that when she was asked if there was anything that she wanted to add to the proposed goals, she stated that she wanted the opportunity to speak with J.G.'s therapist, but was told that that was not necessary because J.G.'s therapist wrote the goals. (Pl. 56.1 ¶ 29). Courtadon testified that J.G.'s mother was not given a meaningful opportunity to look at, read, understand, or comment on what the CSE was discussing during the meeting. (T. 808–09; Pl. 56.1 ¶ 32).

A request was made for the CSE team to consider a deferral to the Central Based Support Team ("CBST"),[1] and Courtadon testified that Ms. Ye responded that this could not be considered because the team had to recommend a public school placement. (Pl. 56.1 ¶ 36).

Courtadon and J.G.'s mother testified that the team did not offer to evaluate J.G. or ask P.G. to make J.G. available for such testing by DOE, nor did they inform J.G.'s mother of her right to ask for an evaluation. (Pl. 56.1 ¶ 38).

---

1. After evaluating all options available at public schools, an IEP Team may defer to a CBST to investigate an appropriate private school placement. *See* http://schoolsMyc.gov/Academics/SpecialEducation/programs/environment/state-supported-schools.htm

Though J.G.'s mother asked the CSE team to consider Eagle Hill, a New York State-approved emergency interim placement, Ms. Foschetta testified that she did not consider it. (T. 608–09; Pl. 56.1 ¶ 39). Foschetta also testified that she did not consider "mainstreaming" J.G. during the 2010–2011 school year. (Pl. 56.1 ¶ 40).

Ms. Williams, J.G.'s then-current special education teacher, only attended half of the meeting. (Pl. 56.1 ¶ 41). Williams indicated at the beginning of the meeting that she could only participate for 30 minutes, and the CSE team therefore commenced the meeting by discussing J.G.'s academics and "gathering the teacher's input." (Def. 56.1 ¶ 27).[2] Ms. Williams was no longer present for the discussion of J.G.'s speech goals, counseling goals, or occupational therapy goals. (Pl. 56.1 ¶ 41). Foschetta testified that J.G.'s mother never requested that the meeting be adjourned to another time when Williams could be present. (Def. 56.1 ¶¶ 28–29).

No one at the meeting was a speech and language pathologist or an occupational therapist, and the CSE had not spoken to J.G.'s Aaron School therapists in preparation for the meeting. (Pl. 56.1 ¶ 44).

A copy of the IEP that was formulated at the meeting was later sent to J.G.'s parents in the mail. (Pl. 56.1 ¶ 52). The CSE classified J.G. as Speech or Language Impaired and recommended a 10–month program in a special class in a community school with a staffing ratio of 12:1:1,[3] and related services of speech therapy ("ST") (1 × 40 minutes per week individually and 2 × 40 minutes per week in a group of two), occupation therapy ("OT") (1 × 40 minutes per week individually and 1 × 40 minutes per week in a group of two), and counseling ("CO") (1 × 40 minutes per week in a group of two). (Pl. 56.1 ¶ 15).

### B. *The Wagner Placement*

On August 6, 2010, a Final Notice of Recommendation ("FNR") was sent to the Parents offering J.G. a placement at a community school (Junior High School 167, Robert F. Wagner ("Wagner")), in a 12:1:1 classroom. (Pl. 56.1 ¶ 64). On August 13, 2010, J.G.'s mother sent a letter to the DOE asking a series of questions about Wagner and stating that she intended to send J.G. to Eagle Hill until concerns were resolved. (Ex. B).

Testimony in the record indicates that Wagner is a school of approximately 1280 students between sixth and eighth grade, approximately 210 of whom have IEPs. (Def. 56.1 ¶ 61–62). Testimony further indicates that Wagner has a full-time psychologist, a part-time psychologist, three guidance counselors, two full-time speech and language therapists, and two part-time occupational therapists. (Def. 56.1 ¶ 65).

Brenda McDonagh, the Assistant Principal at Wagner, testified that if J.G. had gone to Wagner, he would have been placed in either Mr. Merchant's homeroom number 716, or Ms. Tavano's homeroom number 616. (Def. 56.1 ¶ 66; *cf.* Pl. 56.1 ¶ 69). Ms. McDonagh testified that in homeroom 616, there were 10 students at the start of the 2010–11 school year and in homeroom 716, there were 7 students. (Def. 56.1 ¶¶ 67–68). The students in those classes were diagnosed as learning

---

2. Plaintiffs' 56.1(b) statement disputes this assertion without providing a citation to anything in the record creating a dispute. (*See* Pl. 56.1(b) ¶ 27). Indeed, if this were a typical summary judgment motion, the Court would have discretion not to consider evidence what a party has failed to point out,

and to deem uncontested 56.1 assertions as admitted. *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001)

3. That means each class has 12 students, one teacher, and two paraprofessionals in the room. (Tr. at 155).

disabled, emotionally disturbed, speech or language impaired, or otherwise health impaired. (Pl. 56.1 ¶ 70). None of the students had a paraprofessional assigned to them individually. (Pl. 56.1 ¶ 72). J.G. would have been the highest functioning student in either of those classes. (Def. 56.1 ¶ 74).

After reviewing J.G.'s IEP, Mr. Merchant stated that J.G. "sounded like one of [his] students." (Def. 56.1 ¶ 82). To address J.G.'s social development issues, he would have been placed in Wagner's advisory program, which focused on social and organizational skills, and encouraged J.G.'s social development within the curriculum. (Def. 56.1 ¶ 90).

The Parents complained that Wagner was too large. (Def. 56.1 ¶ 91). Ms. McDonagh testified that Wagner would have helped J.G. transition to Wagner by giving him a tour of the school, introducing him to guidance counselors and teachers in advance, and by introducing him to other students and teachers in the first few weeks of school, as well as by the use of parent workshops. (Def. 56.1 ¶ 92).

The Parents visited Wagner in November of 2010. (Def. 56.1 ¶ 103–04; Tr. at 834). On November 23, 2010, the Parents sent a letter to DOE, rejecting the recommended placement at Wagner. (*Id.*).

### C. *J.G.'s Enrollment in Eagle Hill*

Prior to the April 26 Meeting, J.G.'s parents had already signed an enrollment contract at Eagle Hill and paid a $5,480 non-refundable deposit. (Def. 56.1 ¶ 106).[4] Annual tuition at Eagle School for the 2010–11 school year was $54,800. (Def. 56.1 ¶ 107).

Eagle Hill is a school with 250 students ranging between ages six and sixteen, all of whom have disabilities, including learning disabilities, speech or language impairment, and other health impairments. (Def. 56.1 ¶¶ 108–09). Eagle Hill does not provide any opportunity for mainstreaming for its students during the day, though students compete against other schools in sports after class.[5] Eagle Hill has 75 full-time teaching faculty, four speech and language clinicians, one occupational therapist, one motor training specialist, two school psychologists, two social workers, ten academic advisors, and a nurse. (Def. 56.1 ¶ 113).

### D. *The Impartial Hearing*

On March 4, 2011, the Parents filed a due process complaint ("DPC") and sought an impartial hearing. The Parents' sought funding, prospective funding, and reimbursement of tuition at Eagle Hill, as well as reimbursement for transportation between J.G.'s home in Manhattan and Eagle Hill, which is in Greenwich, Connecticut. (Def. 56.1 ¶ 125).

The IHO conducted a hearing over seven separate days and issued a report on December 13, 2011 (corrected January 5, 2012) concluding that DOE failed to provide J.G. a FAPE. (Def. 56.1 ¶ 128). Transportation reimbursement was denied because the Parents did not produce any evidence regarding this request. (Def. 56.1 ¶ 129). The IHO concluded that Eagle Hill was an appropriate placement for

---

**4.** The IHO indicated that the mother thought that she might be able to receive some kind of a refund had J.G. not attended Eagle Hill (IHO Dec. at 12), though the mother's testimony is equivocal on this point and, even to the extent that she makes this assertion, she appears to have had no reason believe that she could receive a return of the "non-refundable" deposit. (Tr. at 838, 854).

**5.** Plaintiffs contest the absence of mainstreaming during the day, but do not cite any evidentiary basis for their assertion. (Pl. 56.1(b) ¶ 110).

J.G. In light of certain equitable consider-ations, which the IHO identified in part as the parents' cooperation with the DOE, the IHO awarded reimbursement in the amount of $54,800. (Def. 56.1 ¶¶ 131–32).

### E. The SRO Appeal

The DOE appealed the IHO decision to the SRO via a Verified Petition dated Jan-uary 12, 2012. In response, the Parents both answered and cross appealed on Feb-ruary 6, 2012. After having conducted an independent review of the record, the SRO issued its report on April 6, 2012, revers-ing the IHO's decision, and dismissing the Parents' cross-appeal.

The SRO dismissed as meritless all of Plaintiffs' complaints regarding the proce-dural adequacy of the IEP. (SRO Dec. at 10). The SRO concluded that the IEP was substantively adequate, and that it was not rendered inadequate because it failed to state certain of J.G.'s issues or to provide for a "transition services" program. (SRO Dec. at 10–17). The SRO determined that he need not address Plaintiffs' objections to a 12:1:1 classroom because the parents did not raise that objection in their due process complaint. (SRO Dec. at 8–9). Though the SRO also concluded that the parents waived their right to object to the adequacy of the Wagner placement, he nonetheless determined that J.G.'s pro-posed placement at Wagner would not have denied him a FAPE. (SRO Dec. at 17–19).

The Parents filed the instant action in federal court on July 5, 2012.

### III. DISCUSSION

■ For the reasons set forth below, the Court concludes that the IEP was both procedurally and substantively sufficient to provide J.G. with a FAPE.

### A. The IEP Was Devised in a Proce-durally Sound Manner That Did Not Deny J.G. a FAPE

The SRO concluded that the IEP was procedurally reasonable, and the IHO con-curred that whatever errors may have oc-curred did not impinge upon J.G.'s moth-er's ability to meaningfully participate in the meeting. (SRO Dec. at 8–14; IHO Dec. at 23). Such conclusions may be rejected when a preponderance of the ob-jective evidence indicates that they are not carefully reasoned. *M.H.*, 685 F.3d at 248. In this case, however, as discussed below, the evidence in the record fully supports the conclusion of the IHO and the SRO that the IEP was procedurally reasonable.

#### 1. J.G.'s Mother Was Able to Partake in the April 26 Meeting in a Meaningful Manner

Plaintiffs' procedural inadequacy argu-ment is largely based on allegations that J.G.'s mother and the parent advocate, Ms. Courtadon, were not provided with a copy of the proposed IEP at the April 26 Meet-ing, and that the team members read too quickly, making it difficult for the mother and the parent advocate to keep up. (Pl. Br. at 7). Yet Ms. Foschetta testified that as the CSE team read the IEP aloud, they did not "continue from one page to the next without asking the parent her per-spective, if she had any changes she would like to make, modifications, or whatever input that she deemed appropriate. So [the mother] had input throughout." (Tr. at 168:12–18).[6] And Plaintiffs concede that J.G.'s mother did not ask to see a copy of the IEP that the CSE team was reading from. (Def. 56.1 ¶ 25).

Plaintiffs point to testimony from Ms. Courtadon that other meeting participants' comments confused her for a time, and

---

**6.** Plaintiffs appear to assert that Foschetta's testimony was not accurate without pointing to anything that undermines the credibility of her testimony.

that the speed at which it was read made it difficult to process. (*See* Tr. at 808). But Courtadon later testified that when she asked the participants to slow down the speed at which they were reading, they listened to her. (Tr. at 811). And the procedural soundness of the meeting was not affected by a misunderstanding that Courtadon may have had at any given time as to which document the team members were reading.

Nonetheless, Plaintiffs argue that in light of this testimony from Courtadon, the SRO improperly relied on meeting minutes stating that "the parent participated in the CSE process and was asked several times for input as well as whether she agreed with the information in the IEP." (SRO Dec. at 10). However, nothing in Courtadon's testimony leads the Court to believe that the SRO should not have relied on meeting minutes suggesting that J.G.'s mother participated in the meeting and was asked for input. And none of the testimony from Courtadon cited by Plaintiffs renders erroneous the IHO and SRO's determination that the mother was able to participate meaningfully in the April 26 meeting. Indeed, if the mother was having trouble following what was being read to her, she could have asked to read a copy herself, which she concedes that she did not do. (Def. 56.1 ¶ 25).

Plaintiffs assert that the SRO improperly ignored "testimony in the record that was the crux of the IHO's credibility-based determination" that the parents failed to have a meaningful opportunity to participate. (*See* Pl. Br. at 8). This argument misrepresents the IHO's findings. Indeed, the IHO, though it noted that "the IEP was quickly read to all parties," stated later in the same paragraph that "it was clear that the parent and its advocate did, in fact, participate and make contributions at the CSE meeting" and that no proce-

dural violations occurred that denied J.G. a FAPE. (IHO Dec. at 23).

2. The IEP Is Not Procedurally Invalid Because Ms. Williams Was Only Present for the First Thirty Minutes of the April 26 Meeting

Plaintiffs also argue that the CSE team was not properly constituted at the April 26, 2010 meeting when J.G.'s IEP was developed, and that the IEP is therefore procedurally defective. The contention is that Ms. Williams was only present for the first thirty minutes of the April 26 Meeting, and that her absence from the rest of the meeting constituted a fatal procedural flaw in the development of the IEP. The Court disagrees.

As an initial matter, Plaintiffs failed to raise this argument with any specificity prior to this appeal, only averring generally that "[u]pon information and belief, the CSE review team was not validly constituted ..." (DPC at 2) and that "[t]he CSE team was not validly composed." (Cross–App.¶ 67). The SRO therefore addressed these arguments by stating that the "parents argue that the CSE was improperly composed, but do not specify how the CSE failed to meet CSE composition requirements...." (SRO Dec. at 9).

Some authority indicates that Plaintiffs have therefore waived their ability to argue that the CSE team was not properly constituted in light of Williams' absence from a *portion* of the April 26 Meeting. 20 U.S.C. § 1415(f)(3)(B) ("The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice ... unless the other party agrees otherwise"); 34 C.F.R. § 300.511(d); 8 N.Y.C.R.R. § 200.5(j)(1)(ii). Nonetheless, courts in this district have allowed arguments on appeal that were not made below, as the statute allows the district court to consider additional evidence. *Arlington*

*Cent. Sch. Dist. v. D.K. and K.K., o/b/o their Disabled Son C.K.,* 2002 WL 31521158, at *9 (S.D.N.Y. Nov. 14, 2002). Here, though there is no new evidence, only a new argument based on the same evidence, the Court nonetheless considers the argument and, for the reasons discussed below, rejects it.

First, the federal statute only requires the presence of "not less than 1" special education teacher, 20 U.S.C. § 1414(d)(1)(B)(iii), and Ms. Ye, who was present throughout, is a special education teacher. The statute only requires the presence of the student's regular teacher "if the child is, or may be, participating in the regular education environment." 20 U.S.C. § 1414(d)(1)(B)(ii). Here, there was no discussion of "mainstreaming" J.G. (Tr. at 620).

Second, Ms. Foschetta testified that Ms. Williams announced at the beginning of the meeting that she only had a limited amount of time, and that, as a result, academic issues were discussed first. (Tr. at 168–69).[7] Moreover, before Ms. Williams got off the phone, she was asked for her perspective with regard to related services and a final recommendation. (Tr. at 170). Foschetta testified that no one objected to Ms. Williams' absence from the rest of the meeting. (*Id.*). Given that Ms. Williams was able to participate for thirty minutes, that the meeting's schedule was organized to allow Ms. Williams to participate in the academic discussion for which her presence was most relevant, and that she had the opportunity to provide her perspective with respect to related services and a final recommendation, the Court concludes that Ms. Williams' absence from parts of the meeting did not constitute a procedural error that denied J.G. a FAPE. This conclusion is buttressed by the lack of any objection on the part of the parent at the time of the meeting, or any serious argument on this point by Plaintiffs prior to the appeal to this Court.[8]

Moreover, even if continuing the meeting in Ms. Williams' absence was error, and the Court sees no reason why it was, such an error would not have in and of itself denied J.G. a FAPE. The Second Circuit has been clear that not every error in the process of developing an IEP results in denial of a FAPE. *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 381 (2d Cir.2003). Rather, a FAPE is denied only if the procedural inadequacies "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). As discussed—and as explicitly found by the IHO—J.G.'s mother and the parent advocate had an opportunity to participate and make contributions at the CSE meeting. And the Court is not persuaded that a preponderance of the evidence in the record should have compelled a finding that Ms. Williams' absence caused deprivation

---

7. Plaintiff's 56.1(b) statement appears to contest this assertion, but does not provide a citation to any source providing testimony to the contrary. *See* Pl. 56.1(b) ¶ 27. As previously stated, Plaintiffs point to nothing in the record suggesting that Foschetta's testimony should not have been credited.

8. Contrary to Plaintiffs' argument (Reply at 3), consideration of the mother's lack of objection at the April 26 Meeting does not "shift the burden" to parents to object when a CSE team fails to meet its responsibilities. The Court does not consider the mother's lack of an objection as a dispositive fact, but also does not think it irrelevant to the determination of whether the meeting was administered in a procedurally fair and reasonable manner.

of an educational benefit or otherwise impeded J.G.'s right to a FAPE.

Plaintiffs' brief cites to two decisions by SROs from separate cases concluding that failure of a special education teacher to participate in the entire meeting "contributed" to a finding that it was not validly constituted and that telephone participation is only permissible when the person on the phone has a full opportunity to "hear all information" and "have access to the same material available to all others involved in this process." (Pl. Br. at 10). The SRO decisions, which are not binding precedent, are distinguishable. That a previous SRO decision concluded that the partial absence of a special education teacher "contributed" to a finding that a CSE meeting was not validly constituted does not require the conclusion that Ms. Williams' presence for only one half hour of the April 26 Meeting rendered the CSE team invalidly constituted. Moreover, here, Ms. Ye, who is herself a special education teacher (though not J.G.'s teacher), participated in the entire meeting.

In short, even if it was an error to continue the meeting after Ms. Williams got off the phone—and after she was asked to provide a final opinion and remained present throughout the discussion on academics—the error did not deny J.G. a FAPE.

\*　　\*　　\*　　\*　　\*　　\*

A preponderance of the objective evidence fully supports the SRO's conclusion that the IEP was developed in a procedurally sound manner.

B. *The IEP Was Substantively Reasonable*

■ Pursuant to New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan. *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012). "The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 252 (2d Cir.2012). And the appropriate education mandated by IDEA does not require states to "maximize the potential of handicapped children." *Rowley*, 458 U.S. at 189–90, 196 n. 21, 102 S.Ct. 3034. Rather, school districts must offer "a basic floor of opportunity," *id.* at 200, 102 S.Ct. 3034—"in other words, they must provide a program that is 'likely to produce progress, not regression.'" *C.L. v. New York City Dep't of Educ.*, 2013 WL 93361, at \*5 (S.D.N.Y. Jan. 3, 2013) (citing *Walczak*, 142 F.3d at 130). The IEP formulated by the district must be "reasonably calculated to enable the student to receive educational benefits." *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. In light of the relative institutional competence of the state's adjudicators in addressing matters of education policy, more deference is owed to the SRO's decision regarding the substantive adequacy of the IEP than was owed in the prior analysis regarding procedural adequacy. *M.H.*, 685 F.3d at 244.

### 1. The IEP Adequately Assessed the Student's Level of Performance Needs

■ Plaintiffs argue that the IEP was inadequate because it did not accurately describe J.G.'s then-present levels of performance and needs. Specifically, Plaintiffs argue that the IEP failed to acknowledge J.G.'s "extremely uneven [cognitive] profile," failed to mention that J.G. has "anxiety" or to identify the source of that "anxiety," and did not state that J.G. "could apply study skills, self-monitor attention, and follow multi-step directions." Plaintiffs cite no legal authority in support of its argument that these considerations

should have been explicitly stated in the IEP, and the Court has found none.[9]

To the contrary, an IEP is required to include: (1) the student's present levels of academic achievement and functional performance; (2) measurable annual goals for the child; (3) the method used to measure the student's progress toward those goals; (4) the special education and related services that the IEP recommends; (5) an explanation of the extent to which the student will be educated with "nondisabled" peers; (6) the reasons for any alternate assessments; and (7) the start date for recommended services, their duration, and their frequency. 20 U.S.C. § 1414(d)(1)(A); 8 NYCRR tit. 8 § 200.4(d)(2). The SRO noted that a student's diagnosis does not need to be stated in the IEP. (SRO Dec. at 13).

The SRO addressed at length the IEP's handling of J.G.'s special educational needs, concluding that the IEP addressed

> the student's delays in speech-language, attention, and short-term memory as well as [ ] that the student required 'reassurance due to his lack of self-confidence' .... The IEP also indicated that the student responded in a positive manner to redirection and rewards and benefited from reminders, individualized goals, chunking, preview/review of materials, and graphic organizers. Additionally, the student demonstrated difficulties with functioning within a noisy environment, self-regulation, and fine and gross motor skills.... The IEP addressed the student's needs related to sensory regulation and anxiety which was sufficient to address the student's deficits related to his diagnoses of PDD. For example, the IEP provided the student with sensory tools and sensory/body breaks throughout the school day. In addition, the student received counseling services to address his difficulties with anxiety.

According to the advocate, the student's mother was in agreement with the academic levels identified on the IEP. (SRO Dec. at 13–14). As the SRO made clear, the IEP, though not specifically identifying certain of J.G.'s issues, detailed a program that was designed to address precisely those issues. This Court agrees with the analysis of the SRO, and defers to the SRO's educational expertise on this matter.

In short, the Court sees no legal reason why the IEP's failure to specifically state J.G.'s "anxiety" or his ability to "self-monitor attention, and follow multi-step directions" renders the IEP substantively unreasonable in light of the measures outlined in the IEP that the SRO held were specifically designed to address those issues.

### 2. The IEP Provided Adequate, Measured, and Objective Long and Short–Term Goals for J.G.

Plaintiffs next argue that the IEP is substantively inadequate because it does not provide sufficient short and long-term objectives and goals for J.G.

The IDEA and its regulations require that the IEP include short-term and long-term academic and nonacademic goals for each student, as well as evaluative procedures for measuring a student's progress in achieving the short and long-term goals contained in the IEP. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(III) (directing that IEP include "a description of how the child's progress toward meeting the annual goals ... will be measured"); 34 C.F.R. § 300.320(a)(2, 3); 8 NYCRR § 200.4(d)(2)(H).

Here, the IEP provided goals and objectives sufficient to meet J.G.'s needs. The IEP contains 14 annual goals and four short-term objectives related to reading,

---

**9.** Plaintiffs do not address this argument in their reply.

writing, math, study skills, self-advocacy, social skills, cognitive flexibility, conversational speed, verbal reasoning, problem solving, frustration tolerance and group skills. (Joint Ex. "a"). As discussed in Section "II.A" above, the IEP provided for speech therapy (once per week individually and twice per week in a group of two), occupation therapy (once per week individually and twice per week in a group of two), and counseling (once per week in a group of two). (Pl. 56.1 ¶ 15). The IEP proscribed certain mechanisms to assist J.G., including (1) use of graphic organizers, (2) redirection, repetition, and preview of materials, (3) modeling, (4) instruction regarding perspective taking, anxiety, social problem solving, and transitions, and (5) provisions related to services of counseling and occupational therapy.

At base, the SRO decision reviewed the goals and the procedures proscribed by the IEP and, following a well-considered analysis, concluded that they were sufficient to address the student's needs. (SRO Dec. at 14–15). The SRO concluded that the goals were sufficiently specific to measure J.G.'s progress throughout the school year and to gauge the need for continuation or revision. (*Id.*). These matters pertain to educational policy, and the SRO's decision on this issue, which is well-reasoned and thorough, is entitled to deference. *R.E.*, 694 F.3d at 184.

Plaintiffs' argument that it was error to rely on an 11–month–old report—without indicating what changes may have occurred since the time of the report—is not supported by case law and is unavailing.

In short, in light of the SRO's analysis regarding the sufficiency of the goals and objectives in the IEP to provide J.G. with a FAPE, the Court may not substitute in its own judgment for that of the SRO on this issue, even if it were to disagree with the SRO, which it does not. The SRO's determination regarding the adequacy of the goals and objective in the IEP is entitled deference.

### 3. Plaintiffs "Transition Services" Argument is Without Merit

Next, Plaintiffs argue that the absence from the IEP of a specific transition support strategy to help J.G. transition from the private Aaron School to the "community" Wagner school denied J.G. a FAPE. The Court Disagrees.

The SRO concluded that, though it "may" have been appropriate to consider an explicit transitional support service in the "body" of the IEP,[10] the services proscribed were "designed" to "address the student's anxiety." (SRO Dec. at 16). Thus, the SRO concluded that "in light of the array of other services provided in the IEP," the absence of specified support services to help J.G. "transition" from the private school to a public school did not rise to the level of something that could deprive J.G. a FAPE. (*Id.*). The record supports this analysis.

### 4. Wagner Was an Appropriate Placement Option

#### i. J.G. Would Have Been Properly Grouped

Plaintiffs argue that the other students with whom J.G. would have been grouped at Wagner would have denied him a FAPE. The Court disagrees.

State regulations require that a student be suitably grouped with other students having similar levels of academic achievement, social and physical development, and management needs. 8 N.Y.C.R.R. § 200.6(h)(2). Uniformity of needs, how-

---

**10.** The Court's analysis is based entirely on what was in the IEP and not on testimony about what may have happened, independent of what was included in the IEP, should J.G. have attended Wagner. *See R.E.*, 694 F.3d at 195.

ever, is not required. *Cf. Walczak*, 142 F.3d at 133–34. If the range of the students' functional levels exceeds three years, parents must receive a breakdown of each student's levels. 8 N.Y.C.R.R. § 200.6(h)(7).

J.G.'s English Language Arts ("ELA") level would have exceeded that of some of his classmates by as much as 3.8 levels, though it would have been equal to that of other classmates. (SRO Dec. at 19). Similarly, his math level would have exceeded some of his classmates' by .8 grade levels, and exceeded other classmates by considerably more than that. (*Id*). In other areas, such as learning issues, management needs, and social development levels, testimony indicated that he would be like the other students in the class. (*Id.;* Tr. at 293).

The IHO's conclusion that J.G.'s grouping at Wagner would have required that he receive individual instruction based on his higher academic levels in certain areas, though he was not good at responding to individual instruction, (IHO Dec. at 24–25), was thorough and considered. But the SRO's opposite conclusion was also considered. *M.H.*, 685 F.3d at 246 ("Where the IHO and SRO disagree, . . . courts must defer to the reasoned conclusions of the SRO as the final state administrative determination."). The SRO determined that the student range was appropriate in light of 12:1:1 nature of the class room, and the generally "similar needs and abilities" of the other students in the class. (SRO Dec. at 19). The SRO noted that determinations about class composition in special classes is based on similarity of needs according not just to levels of academic development, but also levels of social development, physical development, and management needs of the students in the classroom. (SRO Dec. at 18) (citing 8 N.Y.C.R.R. 200.6(h)(2)); *cf. Walczak*, 142 F.3d at 133 (affirming a district's determination to group a student in a classroom with students of different intellectual, social, and behavioral needs, where sufficient similarities existed). The SRO noted that J.G. possessed social/emotional functioning similar to the students in the class where he would have been assigned, and that similarity contributed to the SRO's conclusion that the composition of the classroom was appropriate. (SRO Dec. at 19). The question of how to group students based upon common learning difficulties versus varying levels of academic achievement is one of educational policy in which the Court lacks expertise. *Cf. M.P.G. ex rel. J.P. v. New York City Dep't of Educ.*, 2010 WL 3398256, at *11 (S.D.N.Y. Aug. 27, 2010). Though concisely written, the SRO's conclusions were thoughtful and pertain to educational policy in the state. The Court will not substitute its own judgment for that of the SRO on this issue.

ii. Plaintiffs' Remaining Objections to the Substantive Wagner Placement Are Without Merit

█ Contrary to Plaintiffs' assertion, the SRO did not err by failing to consider over 100 alleged infractions at Wagner, or to consider Plaintiffs' speculation that Wagner would not implement the IEP appropriately. Indeed, such considerations appear to be impermissible under the Second Circuit's decision in *R.E.*, 694 F.3d at 187 ("Our evaluation must focus on the written plan offered to the parents, however. Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement. A suggestion that some students are underserved cannot overcome the particularly important deference that we afford the SRO's assessment of the plan's substantive adequacy.") (internal quotation marks omitted). Finally, this Court defers to the SRO's expertise in determining that the overall size of the

school—that is, the number of students in the entire school, beyond the small, specialized 12:1:1 class where J.G. would have been placed—would not have denied J.G. a FAPE.[11]

### 5. The SRO Erred in Determining that He Need Not Consider the Appropriateness of a 12:1:1 Classroom

Plaintiffs finally object to the appropriateness of a 12:1:1 classroom for J.G. The IHO concluded that such a placement was not appropriate. (IHO Dec. at 23–24). Because the SRO erroneously concluded that he need not consider Plaintiffs' objections to a 12:1:1 classroom, and therefore need not address the IHO's ruling on that issue, a remand to the SRO is appropriate so that he may consider the matter in the first instance. (SRO Dec. at 8–9).

 The SRO determined that Plaintiffs waived any objection to a 12:1:1 classroom by failing to raise the argument in their due process complaint, even though the IHO addressed the issue in her decision. (SRO Dec. at 8–9). The Second Circuit has been clear that parents "must state all of the alleged deficiencies in the IEP in their initial due process complaint" and that "substantive amendments to the parents' claims are not permitted." *R.E.*, 694 F.3d at 187. Nonetheless, in *M.H.*, the Second Circuit concluded that the DOE opened the door to an issue that the parents would have otherwise waived when it raised the issue in its opening argument and elicited testimony about it from one of its witnesses on direct examination. *M.H.*, 685 F.3d at 250–51 ("[I]t does not follow from the fact that the DOE bears the burden of demonstrating that the IEP provides a FAPE that it should be permitted to argue issues outside the scope of the due process complaint without "opening

the door" for the plaintiff."). Similarly, in the present case, it was the DOE lawyer who raised the 12:1:1 class in her opening statement and elicited testimony on direct examination that the IEP was appropriate in part because it proscribed a 12:1:1 placement. (Tr. at 140–43, 155–56). That the DOE lawyer did not elicit this information by accident is evinced by her asking a follow up question on direct examination on the 12:1:1 issue. (Tr. at 155–56). In light of the DOE's introducing the topic in this manner and, based on the Second Circuit's holding in *M.H.*, the door was opened for Plaintiffs to object to the propriety of a 12:1: placement. *M.H.*, 685 F.3d at 250.

The Court notes that the IHO's conclusion that a 12:1:1 placement was inappropriate for J.G. appears to have been based at least in part on a mischaracterization of the record. The IHO wrote that "[i]t was evident at the CSE meeting that no one at the CSE meeting thought that a 12:1:1 setting was appropriate for the decision." (IHO Dec. at 23). This is simply not correct. J.G.'s then-current special education teacher stated that a 12:1:1 classroom "was warranted." (Tr. at 191). Foschetta, the district's representative, testified that "given that [Ms. Williams] was the individual working with him every day, we certainly—we listened to her and took her perspective into consideration," specifically Ms. Williams' views regarding the appropriateness of a 12:1:1 placement. (*Id.*).

Plaintiffs argue that the IHO made a "credibility determination," discrediting Foschetta in favor of testimony from Courtadon, the parent representative, that J.G. needed more support than a 12:1:1 classroom could provide. (Pl. Reply at 4). However, though it is for the IHO to

---

11. Because the Court concludes that Plaintiffs' arguments related to the size and composition of J.G.'s potential class at Wagner are unavailing, it need not address the SRO's conclusion that Plaintiffs waived their rights to object to these issues.

weigh the credibility of competing witnesses, *cf. M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 252 (2d Cir.2012), the IHO did not state that it was making such a credibility assessment, much less explain why. *M.H.*, 685 F.3d at 241 ("SRO's or IHO's factual findings must be reasoned and supported by the record to warrant deference.") (internal quotation marks omitted). And Plaintiffs point to nothing in the record supporting a conclusion that Foschetta testified inaccurately.

■■■ Nonetheless, rather than review the IHO's determination and draw its own conclusion regarding the appropriateness of a 12:1:1 setting for J.G., the Court finds it appropriate to remand the question to the SRO for consideration of this education policy issue in the first instance. *R.L. v. New York City Dep't of Educ.*, 938 F.Supp.2d 417, 436, 2013 WL 1497306, at *16 (E.D.N.Y. Apr. 12, 103) ("Remand is appropriate to obtain the necessary educational expertise of the IHO and the SRO."); *FB v. New York City Dep't of Educ.*, 923 F.Supp.2d 570, 589 (S.D.N.Y. 2013) ("The Court is ill-equipped to address these claims [including the substantive adequacy of the IEP] in the first instance. The Court instead remands them to the SRO to consider, based on the voluminous record created during the administrative process."); *D.N. v. New York City Dep't of Educ.*, 905 F.Supp.2d 582, 589 (S.D.N.Y.2012) ("Rather than reaching the merits of the unreviewed claims, we remand this matter to the SRO, who is 'uniquely well suited to review the content and implementation' of the Student's IEP.") (citing *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 487 (2d Cir.2002); *see also N.Y.C. Dep't of Educ. v. V.S.*, 2011 WL 3273922, at *11 (E.D.N.Y. July 29, 2011) (noting that remand of an IDEA case is appropriate "where the district court has received insufficient guidance from state administrative agencies as to the merits of a case").

## C. *Equitable Considerations*

Though the Court need not now consider the appropriateness of Eagle Hill or the equitable factors, the Court notes that should Plaintiffs return to Federal Court, they will still bear the burden of demonstrating (1) the appropriateness of the placement at Eagle Hill and (2) that the equities favor them. *R.E.*, 694 F.3d at 184. In this case, Plaintiffs will have a difficult time demonstrating that the equities tip in their favor.

Though parents who have never sent their children to public school unquestionably have a right to seek reimbursement if the DOE fails to offer their child a FAPE, *C.L. v. New York City Dep't of Educ.*, 2013 WL 93361, at *9 (S.D.N.Y. Jan. 3, 2013), courts have looked disfavorably upon "plaintiffs [who] never intended to enroll [their child] in a public school and only went through this process hoping to get an award of tuition reimbursement." *J.P. ex rel. D.P. v. New York City Dep't of Educ.*, 2012 WL 359977, at *13 (E.D.N.Y. Feb. 2, 2012). These courts have indicated that such parents cannot meet their burden of demonstrating that the equities tip in their favor. *Id.* ("The record suggests that plaintiffs were attempting to game the system and obtain reimbursement for their son's private school education."); *see also Thies v. N.Y.C. Bd. of Educ.*, 2008 WL 344728, at *4 (S.D.N.Y. Feb. 4, 2008) (denying reimbursement because plaintiffs "demonstrated they did not seriously intend to enroll [their child] in public school" by selecting a private school "without first fulfilling their obligation to work together with school officials to find a placement that was appropriate"); *Werner v. Clarkstown Cent. Sch. Dist.*, 363 F.Supp.2d 656, 661 (S.D.N.Y.2005) ("Obviously what went

on here was the parents decided to send a troubled son to a private school . . ., found a school they liked (with no regard whatever for what his special needs might be, because there had as yet been no assessment and no determination about his needs), got their son accepted at the school, and then took steps to try to get the District to pay for the boy's private education.").

In this case, Plaintiffs put down a nonrefundable deposit for J.G. to be enrolled at Eagle Hill before they even received the IEP, and J.G. was attending Eagle Hill for several months before his mother attempted to visit Wagner, the placement offered by the DOE. It is true that Plaintiffs requested an expedited placement from the CSE in anticipation of the deadline for cancelling a contract with Eagle Hill, which appears to have required payment of a full year's tuition, and that it took the CSE nearly four months to provide a placement. (Tr. at 837–38; Pl. 56.1 ¶¶ 146–47). But the testimony of J.G.'s mother also indicates that she may not "really" have expected to find an appropriate public school placement, and cast doubts about whether she engaged in the IEP process with the intention of trying to find a public school placement for her child. (Tr. at 838). Given these undisputed facts, Plaintiffs will bear a heavy burden in demonstrating that the equities tip in their favor.

### D. *Further Redactions of Plaintiffs' Papers Are Necessary*

The Court has noticed some references to J.G.'s full name that were used in place of his initials in Plaintiffs' reply brief. As a result, the Clerk of Court shall remove Docket Entry Number 18 from the docket sheet. Plaintiffs shall remove the child's name completely from the document (*see, e.g.,* Dkt. No. 18 at 5) and re-file it using only the child's initials within one week of the date of this opinion.

### CONCLUSION

For the foregoing reasons, the Court GRANTS the DOE's motion and DENIES the parents' motion on all of the issues raised except for the propriety of a 12:1:1 placement. The IHO's conclusions regarding the propriety of a 12:1:1 placement are remanded to the SRO to review in the first instance.