**GB and DB, individually and on behalf of AB, Plaintiff,**

v.

**NEW YORK CITY DEPARTMENT OF EDUCATION, Defendant.**

No. 14 Civ. 9951 (CM)

United States District Court, S.D. New York.

Signed November 5, 2015

Steven Laurence Goldstein, Steven L. Goldstein, Attorney-at-Law, New York, NY, for Plaintiff.

Lyssa M. Sampson, Lesley Berson Mbaye, New York City Law Department, New York, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

McMahon, District Judge.

Plaintiffs GB and DB (the "Parents"), individually and on behalf of their son, AB, bring this action against Defendant New York City Department of Education ("DOE"), pursuant to then Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, Section 504 of the Rehabilitation Act of

1973, 29 U.S.C. §§ 794 *et seq.*, and Article 89 of the New York State Education Law, N.Y. Educ. L. §§ 4401 *et seq.*

The Parents are seeking review of the November 6, 2014, administrative decision of State Review Officer Kristen G. Casey ("SRO."), which substantively reversed the decision of Impartial Hearing Officer Daniel Ajello ("IHO"), who found that AB's Individualized Education Plan ("IEP") did not provide a free appropriate public education ("FAPE") under IDEA. The Parents challenge the SRO's decision and seek reimbursement for the cost of AB's enrollment in the Rebecca School, a private school in which the Parents unilaterally enrolled AB for the 2012–2013 school year. The parties have filed cross-motions for summary judgment.

## BACKGROUND

### I. Underlying Facts

AB was born on October 10, 1994 and is classified as a student with autism. (Def. Ex. 1).[1] AB has sensory integration dysfunction and attention deficits, and he is especially sensitive to auditory and visual input. (Tr. 161–162, Tr. 215–216, Pl. Ex. M–N). When AB becomes overwhelmed, he retreats inwardly, and becomes cognitively unavailable for learning. (Tr. 162, 216, 416–417).

AB also has a seizure disorder, multiple food allergies, and Pediatric Acquired Neurological Disorder Associated with Strep ("PANDAS"), which occurs when strep bacteria affect the brain and cause neurological dysfunction including heightened anxiety and obsessive compulsive disorder ("OCD") type behaviors. (Pl. Ex. M). For PANDAS symptoms are treated with antibiotics, but the underlying disease cannot be cured, so any exposure to strep

can cause the symptoms reemerge, possibly even more severely than the initial episode. For his seizure disorder, AB needs to be in a climate-controlled environment and to remain well-hydrated, as he is at risk for seizures when he is dehydrated or overheated. (Tr. 411–414, Ex. N). AB has not had a seizure for several years, but he continues to be at risk for having a seizure at any time. (Tr. 411–414, Ex. N).

AB has attended the Rebecca School, a private school for students with developmental delays, since 2006. (Tr. 135–136, 157, 159, 394–395). For the 2006–2007 school year the DOE did not provide AB with a school placement, and as a result, in January 2007, an IHO ordered the DOE to fund AB's placement at Rebecca for the 2006–2007 school year. (Pl. Ex. B). Subsequent impartial hearings resulted in settlements whereby the DOE paid for AB to attend Rebecca every year through the 2011–2012 school year. (TR. 397).

AB has made steady progress at Rebecca. (Pl. Ex. H, I, J, K, and L). At Rebecca he receives occupational therapy to address his sensory processing issues. (Tr. 163–164). This is administered by way of a "sensory diet," which includes music therapy to help address his auditory sensitivities, and deep pressure to help calm him physically. (Tr. 165–167). Rebecca personnel immediately alert the Parents to any potential exposure AB might have to Strep, so that precautions may be taken to avoid a PANDAS relapse. (Tr. 409). As a result, his PANDAS symptoms are under control. (Tr. 408). Rebecca is also climate-controlled, and personnel ensure that he remains well-hydrated. (Tr. 411–414, Ex. N).

---

1. Citations to the administrative record, which was filed with this Court under seal, are to evidence admitted at the underlying impartial hearing before the IHO. The DOE's exhibits are referenced as "Def. Ex.," and the Parents' Exhibits as "Pl. Ex." Citations preceded by "Tr." are to pages from the transcript of the impartial hearing.

## II. AB's IEP for the 2012–2013 School Year

On February 14, 2012, the DOE's Committee on Special Education ("CSE") convened to develop AB's IEP for the 2012–2013 school year. (Def. Ex. 1; Tr. 38). The CSE consisted of: Michelina Leone–Flick (a DOE social worker), Craig Czarnecki (a DOE school psychologist who also served as District Representative), Lili Weeks (a DOE special education teacher), Carmen Garcia (a district parent member), Joshua Rich (AB's then-current teacher at Rebecca), Andrea Albert (a Rebecca social worker), Pamela Leff (a Rebecca social worker intern), and AB's mother (GB). (Def. Ex. 1.13; Tr. 39–40). None of the DOE's participants was familiar with AB. (Tr. 103–105).

In developing AB's IEP, the CSE team reviewed and relied almost entirely on a December 2011 Interdisciplinary Transition Program Report of Progress Update from Rebecca (the "Rebecca Progress Report"). (Def. Ex. 2; Tr. 40–42, 53–55, 82, 102–103). The CSE team also listened to input from GB and from AB's Rebecca teacher, and discussed AB's IEP from the prior year. (Tr. 63, 65–66, 104–105). Leone–Flick testified that the CSE gave weight to the opinion of GB and AB's Rebecca teacher on certain IEP drafting issues, particularly the drafting of the annual goals. (Tr. 75–79, 108). For example, the CSE changed certain goals in the IEP that provided for AB to perform a certain task on "three out of five opportunities," if AB's teacher thought "four out of five opportunities" was appropriate. (Tr. 75).

Based on the Progress Report and discussions among the CSE team, the primary recommendations that emerged from the CSE meeting were that AB (1) be placed in a 12–month school year program; (2) be placed in a special class with a 6:1:1 staffing in a District 75 specialized school;

(3) receive related services, including Speech and Language Therapy (five 45–minute individual sessions per week), occupational therapy (five 45–minute individual sessions per week), and counseling (two 45–minute individual sessions per week). (Def. Ex. 1.7–1.8). The IEP additionally contained eleven annual goals and forty short-term objectives, including goals for reading, literacy, interaction with peers and adults, and daily living skills. (Def. Ex. 1.3–1.7; Tr. 56). Several of the short-term objectives used terminology associated with the particular teaching methodology used at the Rebecca School (the "DIR" methodology) that is not used and not compatible with the methodology used at DOE schools. (Tr. 208–209).

The CSE did not conduct a functional behavior assessment ("FBA") of AB in advance of the meeting, and did not later develop a behavior intervention plan ("BIP") for AB. (Tr. 71–72, 109). However, neither GB nor AB's Rebecca teacher suggested that a BIP was necessary. (Tr. 71–72, 109).

At the meeting, both GB and AB's Rebecca teacher expressed concern about the proposed placement, stating their belief that such a setting would not be sufficient to enable AB to learn. (Tr. 300–301, 400). The Parents also expressed concern with the substance of the goals and other information in the IEP. Generally, the Parents are concerned because most of the goals were copied directly out of the Rebecca Progress Report; the Parents believe the goals are too vague to be implemented in a new setting. (Tr. 65–69, 76–77, 80).

GB testified that she felt nothing she said at the meeting mattered, because the CSE had determined the placement to give AB prior to the meeting. (Tr. 418). However, Leone–Flick testified that the CSE had an "open mind," and in fact 8:1:1 and 12:1:1 programs were considered for AB

before a 6:1:1 program was deemed the most appropriate at the meeting. (Tr. 79–80, 105). Leone–Flick also testified that GB did not ask her to consider a CBST placement or a private school placement. (Tr. 105–106). However, GB testified that at the end of the meeting, when she was told AB was being offered a 6:1:1 placement, she asked for an approved private school placement or a placement at Rebecca instead, but was told by the district representative that he could not offer those placements. (Tr. 401).

When GB left the meeting, she was given a copy of the meeting minutes, and told she would receive the typed IEP at a later date in the mail. (Tr. 423–424). Leone–Flick testified that the IEP was typed up by Weeks sometime after the meeting, but Leone–Flick did not know exactly when. (Tr. 80, 82, 84–85, 90–94). The Parents never received the final IEP in the mail after the CSE meeting, and they eventually picked up a copy of it sometime in August or September. (Tr. 423–424, 467–468). Leone–Flick testified that, although she did not type up the IEP or even know when it was typed up, IEPs were usually mailed two to three weeks after an IEP meeting. (Tr. 85–86, 90–91, 94).

### III. The Parents' Rejection of the Proposed Public School Site

On June 1, 2012, the Parents signed a contract with Rebecca for AB's re-enrollment for the twelve-month 2012–2013 school year. (Pl. Ex. O; Tr. 189, 438). The tuition for that school year was $97,700, and the Parents paid a $5,000 non-refundable deposit. (Pl. Ex. O; Tr. 189, 440–441). GB testified that despite having made this payment, if the DOE had offered AB a school and plan that was appropriate, AB would have attended the DOE placement. (Tr. 426).

On June 15, 2012, the Parents' counsel wrote a letter to the CSE asserting the IEP did not offer AB a FAPE for the 2012–2013 school year. (Pl. Ex. G). The Parents raised various procedural and substantive objections to the IEP, and indicated that they were placing AB at Rebecca for July and August 2012 and would seek tuition reimbursement and direct payment for the tuition from the DOE. (Pl. Ex. G). The Parents received no response from the DOE. (Tr. 425).

On or about June 21, 2012, the DOE sent the Parents a Final Notice of Recommendation ("FNR") identifying P079M at the Horan School ("Horan") as the assigned public school site to implement the 2012–2013 IEP. (Def. Ex. 5). The FNR reiterated the CSE team's recommendation of a 6:1:1 special class in a specialized school, along with the related services of individual Speech and Language Therapy, occupational therapy, and counseling. (Def. Ex. 5). The Parents had rejected this placement for AB on two previous occasions. (Pl. Ex. F; Tr. 427–428).

On June 25, 2012, GB wrote a letter to the CSE and acknowledged receipt of the FNR. (Pl. Ex. F). She indicated that she planned to visit Horan on July 10, 2012, and that she had concerns about the placement based on prior visits. (*Id.*). GB wanted to visit the proposed placement earlier than July 10, 2012, but that was the first date she was able to receive an appointment. (Tr. 431–432). This date was after the school year had started. In this letter, GB also raised concerns over the IEP meeting. (Pl. Ex. F). No response was received to this letter.

On July 10, 2012, GB, along with a social worker from the Rebecca School, toured Horan. (Pl. Ex. E). On July 17, 2012, she wrote another letter to the CSE and rejected the placement, stating that she observed no changes at the school, which remained inappropriate for AB, and presented serious health and safety risks to

him. (*Id.*). GB referenced her prior letters and cited several alleged specific flaws in the IEP. (*Id.*). GB also raised various objections to the school placement that was to implement the IEP, including that Horan: (1) lacked air conditioning, which meant that, in extreme heat, AB could have a seizure or become dysregulated; (2) was located too far from their home; (3) would not appropriately group AB; (4) did not have a place for AB for the summer; (5) would not employ an appropriate teaching methodology or adequately address AB's sensory integration, processing difficulties, and related services needs; (6) could cause AB to become dysregulated due to its size and acoustics; and (7) posed safety concerns. (Pl. Ex. E). GB indicated that AB would be re-enrolled at Rebecca and that Plaintiffs would seek DOE funding unless an appropriate program and placement were offered. (Pl. Ex. E). Again, the DOE did not respond to the letter. (Tr. 435).

## IV. The Due Process Complaint and Impartial Hearing

On September 10, 2012, the Parents filed a due process complaint seeking tuition reimbursement and direct payment for the Rebecca tuition. (Pl. Ex. A). The Parents raised various procedural and substantive challenges to the IEP and placement, including that: (1) the IEP was not received until GB picked it up after the start of the school year; (2) the CSE team was not duly constituted because the District Representative and Social Worker were not properly qualified; (3) the annual goals were inappropriate; (4) there was no FBA or BIP; (5) AB's medical conditions were not adequately described; (6) the program and placement were predetermined; (7) the assigned public school was inappropriate; and (8) a Prior Written Notice was not provided. (Def. Ex. A).

On September 27, 2012, the IHO determined that Rebecca was AB's last-agreed upon placement and ordered the DOE to pay the tuition during the pendency of the matter.

An impartial hearing was held over four dates between September 25, 2012 and January 30, 2013. (Tr. 1–486). The IHO issued a decision dated March 8, 2013 ("IHO Decision"). Unfortunately, it seems as though the IHO simply decided to publish his notes; as a result the "decision" is hard to follow. Nonetheless, the Court can discern at least the following findings.

First, he found that the DOE failed to provide the Parents with a copy of the IEP in a timely and appropriate manner. This failure affected the Parents' ability to take part in the creation of the IEP itself and any resulting program offer. (IHO Decision at 30).

Next, the IHO found that the IEP was deficient in a number of respects:

(1) Failure to deal with medical needs and issues;

(2) Failure to articulate present levels of performance;

(3) Failure to articulate appropriate annual goals and short term objectives;

(4) Failure to consider special factors and interfering behaviors and to order a FBA or BIP;

(5) Inappropriate class placement;

(6) Failure to provide parent counseling and training; and

(7) Failure to adequately set forth the student's transition needs and goals consistent with State regulation.

Third the IHO also found the DOE placement was inappropriate both because the "DOE created a flawed IEP which would not have enabled [AB] to be provided with a FAPE and did not accurately reflect the results of evaluations to identify [AB's] needs," and because the Parents raised

"valid concerns regarding [AB's] educational placement, such as transition, sensory and environmental, that were not addressed in the IEP or by the proposed placement." (*Id.* at 38).

The IHO determined that the Parents established Rebecca was an appropriate unilateral placement and that the equities favored them. (*Id.* at 40–41).

The IHO then directed the DOE to reimburse the Parents for the $5,000 deposit they had paid at Rebecca. (*Id.* at 42). Next, he directed that the Parents were responsible for four months tuition, which amounted to $32,968, but that the DOE should reimburse them for up to that amount. (*Id.*). Finally, the IHO directed the DOE to pay any other funds due to Rebecca for the 2012–2013 school year directly to the school, an amount which totaled $65,132. (*Id.*).

The IHO denied the Parents' request for additional evaluations of AB because these evaluations would not impact the 2012–2013 school year, and the Parents and Rebecca are able to provide all relevant information to the DOE when it formulates an IEP. (*Id.* at 43). The IHO also denied the Parents' request for an award of additional compensatory services for AB, because he never suffered any loss of educational service since he was enrolled at Rebecca. (*Id.* at 44). Finally, the IHO denied the Parents' request for a "Nickerson letter." (*Id.*). A "Nickerson letter" is a remedy for a systemic denial of a FAPE, which did not occur in this case as AB received an appropriate education at Rebecca, and the DOE was ordered by the IHO to pay for it. (*Id.*).

## V. The SRO Decision

The DOE appealed the IHO's decision to the Office of State Review. The DOE appealed the IHO's finding that the IEP (1) denied AB a FAPE, and (2) that the equities favored the Parents. DOE did not appeal the finding that Rebecca was an appropriate unilateral placement.

In a decision dated November 6, 2014 ("SRO Decision"), the SRO reversed the decision of the IHO in almost all pertinent respects.

The SRO began by addressing the composition of the CSE team. The SRO rejected the Parents' assertion that the CSE was not duly constituted. She first noted that the district representative was qualified to serve in his role because there was evidence presented that he knew about the educational resources available in the district because he discussed them for the entire CSE meeting. (SRO Decision at 7). Second, even assuming the DOE special education teacher was not qualified (an assertion for which there was no evidence) the presence and participation of the Rebecca teacher and Rebecca social worker meant the CSE had adequate evaluative information to recommend a program for AB. (*Id.* at 7–8).

The SRO next rejected the notion that AB's placement had been predetermined. (*Id.* at 8). It is important to note that the Parents' argument is that the CSE had predetermined that AB should go to a public school program, and so the CSE did not consider a private school program for AB. However, students are only entitled to a FAPE in the "least restrictive environment," in which the child could be served. The DOE's proposed placement is less restrictive than a private school placement, which is the most restrictive placement. Therefore the SRO determined that once the CSE decided a 6:1:1 program was appropriate, they were under no obligation to consider the more restrictive environment of a private school. (*Id.* at 9).

Next, the SRO rejected all conclusions that the February IEP was inadequate.

First, she concluded that the IEP adequately addressed AB's present levels of academic performance because it reflected the information in the Rebecca Progress Report and other information discussed at the CSE meeting, which described AB's abilities in detail. (*Id.* at 10).

Second, she held that AB's sensory needs and social/emotional development were adequately addressed in the IEP, because both were described in detail based on information gained from the Rebecca Progress Report. (*Id.* at 11).

Third, the SRO found AB's physical development and medical needs were adequately addressed in the IEP, because the medical needs section of the IEP reflected everything discussed at the CSE meeting and the Parents failed to provide any other documentation of AB's medical issues. (*Id.* at 11–12).

Fourth, she held that the annual goals and short-term objectives in the IEP targeted the student's identified areas of need and provided sufficient information to guide a teacher in instructing AB and measuring his progress. (*Id.* at 13–14).

Fifth, the SRO concluded that the IEP was not inadequate because the CSE failed to perform an FBA or BIP, since there was no information presented at the CSE meeting that suggested AB engaged in any behaviors that warranted these assessments, and neither AB's Rebecca teacher nor GB requested one. (*Id.* at 15).

Sixth, the SRO held that the proposed placement of AB in a 6:1:1 special class in a specialized school was reasonably calculated to meet AB's special education needs based on the information provided to the CSE, and because the IEP provided for other related services and other accommodations that AB needed. (*Id.* at 16–17).

Seventh, she held the transition services goals were appropriate for AB, because he was rapidly approaching age out of the public education system. (*Id.* at 18–20).

Finally, the SRO found that while the CSE did fail to include a provision for parent counseling and training in the IEP, this was insufficient to deny AB a FAPE. (*Id.* at 17).

The SRO also found that if the DOE committed a procedural violation by delaying the transmittal of the finalized copy of the IEP, the delay did not impede AB's right to a FAPE, or significantly impede the Parents' right to meaningful participate in the CSE process. (*Id.* at 21). The SRO noted that GB had actively participated in the CSE meeting, was provided with a copy of the minutes at the end of the meeting, received the FNR, which reflected the IEP, before the start of the school year, had enough information about the IEP to reject it before the start of the school year. (*Id.* at 20).

Finally, the SRO concluded that the assigned public school site was appropriate. As AB never attended the school, any challenges about how the IEP would have been implemented at the placement were impermissibly speculative. (*Id.* at 21–22).

The Parents appealed.

## DISCUSSION

### VI. Legal Framework

■ The IDEA requires a state that receives federal education funding to provide all children with disabilities with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A); see also *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir.2005). A FAPE should "emphasize [ ] special education and related services designed to meet [a disabled child's] unique needs and prepare [the child] for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). A FAPE must also reflect the IDEA'S " 'strong preference' for

educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 143 (2d Cir.2013) (citing *Walczak*, 142 F.3d at 122). Specifically, IDEA provides that disabled children be educated "[t]o the maximum extent appropriate ... with children who are not disabled," and cautions that "special classes, separate schooling, or other removal of children with disabilities. from the regular educational environment" should only occur "when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).

■ To accomplish that purpose, the DOE must develop an IEP for each disabled child that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *see also* 20 U.S.C. § 1414(d)(1)(A); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 415 (2d Cir.2009). The IEP must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); see also *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir.2007) (citing *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998)). It must provide an " 'appropriate education, not one that provides everything that might be thought desirable by loving Parents.' " *R.B. ex rel. D.B. v. N.Y. Dep't of Educ.*, 603 Fed.Appx. 36, 38 (2d Cir.2015) (summary order) (quoting *Walczak*, 142 F.3d at 132); *see also Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir.2012).

New York has assigned responsibility for developing IEPs to local CSEs. N.Y. Educ. Law § 4402(1)(b)(1); *see also Gagliardo*, 489 .F.3d at 107. The CSE is comprised of the student's parents, a regular or special education teacher, a school psychologist, a school district representative, an individual who can interpret the instructional implications of evaluation results, a school physician, and a parent of another student with a disability. N.Y. Educ. Law § 4402(1)(b)(1)(a). The CSE "examine[s] the student's level of achievement and specific needs and determine[s] an appropriate educational program." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir.2012).

■ If a parent believes that the state has failed to offer his or her child a FAPE, and unilaterally places the child in a private school, he may seek reimbursement from the school district. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009); *see also M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 246 (2d Cir.2012); *Cerra*, 427 F.3d at 192. The parent must then file a due process complaint that challenges the appropriateness of the IEP and attend a hearing before an Independent Hearing Officer. N.Y. Educ. Law § 4404(1). This decision may be appealed to a State Review Officer. 20 U.S.C. § 1415(g)(1); N.Y. Educ. Law § 4404. Either party then has the right to have the SRO's decision reviewed by bringing a civil action in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

■ In *Burlington–Carter, Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12–16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373–74, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the U.S. Supreme Court established a three-step test to determine whether reimbursement of private school tuition is appropriate. Under this *Burlington–Carter* test, the DOE

is required to pay for the private school tuition only if: (1) the program recommended by the IEP was inadequate or inappropriate; (2) the alternative placement the Parents chose was appropriate; and (3) the equitable factors weigh in favor of reimbursement. *See Carter,* 510 U.S. at 12–16, 114 S.Ct. 361; *Sch. Comm. of Burlington,* 471 U.S. at 373–74, 105 S.Ct. 1996; *see also T.M. v. Cornwall Cent. Sch. Dist.,* 752 F.3d 145, 152 (2d Cir.2014); *Frank G. v. Bd. of Educ. of Hyde Park,* 459 F.3d 356, 363–64 (2d Cir.2006).

The first prong of the *Burlington–Carter* test requires a court to review both the procedural and substantive adequacy of the underlying decision. *R.E.,* 694 F.3d at 189–190. The procedural inquiry examines " 'whether the state has complied with the procedures set forth in the IDEA.' " *Id.* at 190 (quoting *Cerra,* 427 F.3d at 192). The substantive inquiry asks whether the IEP was " 'reasonably calculated to enable the child to receive educational benefits.' " *Cerra,* 427 F.3d at 192 (quoting *Rowley,* 458 U.S. at 206–207, 102 S.Ct. 3034). Procedural violations entitle the parents to reimbursement "only if they 'impeded the child's right to a FAPE,' 'significantly impeded the parents' opportunity to participate in the decision-making process,' or 'caused a deprivation of educational benefits.' " *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.,* 725 F.3d 131 (2d Cir.2013) (quoting *R.E.,* 694 F.3d at 190.). "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E.,* 694 F.3d at 190. "Substantive inadequacy automatically entitles the parents to reimbursement." *Id.*

In New York, "the local school board bears the initial burden of establishing the validity of its plan at a due process hearing." *R.E.,* 694 F.3d at 184. If a court determines that either a procedural or substantive inadequacy denied the child

a FAPE, the parents bear the burden of demonstrating that their alternative private placement was appropriate; that is, whether it is " 'reasonably calculated to enable the child to receive educational benefits.' " *Frank G.,* 459 F.3d at 364 (quoting *Rowley,* 458 U.S. at 206–207, 102 S.Ct. 3034). However, parents are "not required . . . to prove that the 'private placement furnishes every special service necessary.' " *C.L. v. Scarsdale Union Free Sch. Dist.,* 744 F.3d 826, 839 (2d Cir.2014) (quoting *Frank G.,* 459 F.3d at 365).

Finally, the parents must demonstrate that the equities favor reimbursement. "Important to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA." *Id.* at 840.

## VII. Standard of Review

In the district court, "IDEA actions generally are resolved on summary judgment." *S.H. v. N.Y.C. Dep't of Educ.,* No. 10 Civ. 1041, 2011 WL 666098, at *2 (S.D.N.Y. Feb. 15, 2011). Summary judgment in the context of an IDEA case "involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *R.E.,* 694 F.3d at 184 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.,* 553 F.3d 165, 171 (2d Cir.2009)).

"In considering an IDEA claim, a district court 'must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.' " *C.L. v. Scarsdale Union Free Sch. Dist.,* 744 F.3d 826, 837–38 (2d Cir.2014) (quoting *Gagliardo,* 489 F.3d at 112). At the same time however, district courts must defer to the administrative decision because "the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of

educational policy." *Id.* Deference is particularly appropriate when the state officer's review "has been thorough and careful," although district courts should not "simply rubber stamp administrative decisions." *Walczak*, 142 F.3d at 129. This standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review." *M.H.*, 685 F.3d at 244 (quotation marks omitted) (alterations omitted).

▮ When the decisions of an IHO and a SRO conflict, the Court should generally defer to the SRO's decision, as the "final decision of the state authorities," *R.E.*, 694 F.3d at 189 (quoting *A.C.*, 553 F.3d at 171), particularly "when the state officer's review 'has been thorough and careful.' " *Id.* at 184 (quoting *Walczak*, 142 F.3d at 129). But when

> [T]he district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges.

*Id.* at 189 (quoting *M.H.*, 685 F.3d at 246).

Administrative decisions that involve the substantive adequacy of an IEP and educational methodologies are to be given more weight than determinations about the procedure according to which an IEP was developed or whether objective indications of a student's progress exist. *See M.H.*, 685 F.3d at 244.

## VIII. The IEP Denied AB a FAPE

At the first step of the *Burlington–Carter* test, the Parents' procedural challenges are that the DOE (1) impeded the Parents' right to meaningfully participate in planning AB's education by not providing the Parents the IEP until after the school year started, (2) did not convene a duly constituted CSE Team, (3) predetermined AB's placement and program, and (4) did not provide the Parents prior written notice. Their substantive challenges are that (1) the IEP does not adequately identify AB's present levels of performance because AB's wide scatter of levels for different academic skills was not mentioned, (2) the IEP does not describe AB's sensory processing disorder or provide any management strategies or techniques, (3) the IEP does not provide meaningful information concerning AB's medical issues or their implications, (4) the IEP contains inappropriate goals, and (5) the IEP did not include necessary behavioral supports. Finally, the Parents also argue Horan was an inappropriate placement for AB because (1) the IEP was not capable of being implemented at Horan because (i) Horan did not have certain facilities mentioned in the IEP, (ii) several goals in the IEP relate to Rebecca's transitions program which does not exist at Horan, and (iii) many of the goals in the IEP relate to the teaching methodology offered at Rebecca which is not offered at Horan, and (2) the facilities, services and educational methodologies available at the Horan school were incompatible with AB's medical, sensory, and specialized educational needs and

The Court first addresses the Parents' procedural challenges, and then their substantive challenges and challenges to the school placement.

### A. Procedural Challenges
### 1. AB was not denied a FAPE based on when the IEP was received

▮ The Parents' challenge the SRO's finding on the ground that the DOE ex-

pressly conceded to the IHO that the Parents did not receive the IEP until after the first day of school, and that the IEP contained substantive differences to the minutes the Parents received.

The IDEA requires the DOE to have a written IEP in effect for each child with a disability at the "beginning of each school year," and the parents of each disabled child must be provided with a copy of the IEP. *See Cerra*, 427 F.3d at 194; 20 U.S.C. §§ 1414(d)(1)(A)(i), 1414(d)(2)(A); 34 C.F.R. § 300.323(a). In New York, the twelve month school year begins on the first day of July of each year. *See* N.Y. Educ. Law § 2(15). The IDEA does not specify the date by which parents must receive the IEP, but the Second Circuit has held that the DOE fulfills its "legal obligations by providing the IEP before the first day of school." *See Cerra*, 427 F.3d at 194.

In the DOE's closing brief before the IHO proceeding, it admitted the Parents did not receive a copy of the IEP until after the first day of school. (IHO Ex. II–5). Accordingly, the procedural violation is established.

However, this Court agrees with the SRO that the failure to provide the IEP to AB's parents before the first day of the school year did not significantly impede the Parents' meaningful participation in the CSE process. The facts in this case are virtually indistinguishable from those in, *K.M. v. New York City Dep't. of Educ.*, No. 13 Civ. 7719, 2015 WL 1442415, at *1 (S.D.N.Y. Mar. 30, 2015). There, my colleague Judge Kaplan held that a student was not denied a FAPE by virtue of the failure to provide the parents with the IEP until after the first day of school, because (1) the parents participated in the CSE meeting where relevant program information was discussed, (2) they received a draft copy of the IEP at that time, and (3) they received the FNR two weeks before the start of the school year. *K.M.*, 2015 WL 1442415, at *1 (S.D.N.Y. Mar. 30, 2015).

There is not a scintilla of evidence that suggests that the failure to provide the Parents with the IEP before the start of the school year in any way inhibited them from participating meaningfully in planning AB's education. Critically important, the Parents rejected the IEP program on June 15, 2012, before they were even notified what that placement would be on June 21, 2012. (Pl. Ex. G). Prior to that time GB actively participated in the CSE meeting where relevant program information was decided; and the Parents received the FNR, which contained AB's program information, before the start of the school year. (Tr. 85, 398–405; Def. Ex. 5). Finally, the procedural violation was eventually remedied when GB picked up a copy of the IEP from the DOE. (Tr. 467–468).

Accordingly, the Court agrees with the SRO that the delay in receiving the IEP did not deny the child a FAPE, or significantly impede the Parents' meaningful participation in the CSE process. It also did not cause a deprivation of educational benefits. *See R.E.*, 694 F.3d at 190.

**2. The CSE team was duly constituted**

The Parents originally challenged two participants on the CSE, both of whom were found qualified by the SRO. The Parents do not here challenge the SRO's findings that the special education teacher was qualified to serve—only her finding that the district representative was qualified.

As respects the district representative, the SRO concluded there was no evidence in the administrative record to suggest a procedural deficiency with the composition of the CSE team that rose to the level of a denial of a FAPE for AB. Although there was no testimony in the record about Czarnecki's particular qualifications to

serve as district representative, there was testimony that he was a school psychologist. (SRO Decision at 6–7; Tr. 39). The SRO also found evidence in the administrative record showing that Czarnecki possessed enough knowledge about the curriculum and local education system to engage in a two hour discussion about AB's proposed program and alternative programs. (Tr. 399; Def. Ex. 4). Because the Parents did not present any evidence to suggest that the district representative lacked sufficient qualifications, the SRO found no procedural violation, let alone one that denied AB a FAPE. (SRO Decision at 7).

■ The Parents challenge the SRO's finding on the ground that the SRO engaged in "circular reasoning;" that the SRO stated that just because Czarnecki "ran" the CSE meeting, he *must* have been duly qualified.

But the SRO did not say that Czarnecki must have been qualified simply because he "ran" the meeting. State and federal law require the attendance of a district representative at the CSE meeting. *See* 20 U.S.C. § 1414(d)(1)(B)(iv); 34 CFR 300.321(a)(4); 8 NYCRR 200.3(a)(1)(v), who must be "(I) qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; (II) knowledgeable about the general education curriculum; and (III) knowledgeable about the availability of resources of the local educational agency." 20 U.S.C. § 1414(d)(1)(B)(iv); 34 CFR 300.321(a)(4); *see* 8 NYCRR 200.3(a)(1)(v). It does not require any other specific qualifications.

The fact that Czarnecki was able to engage in a two hour discussion about AB's needs and the resources of the district, is certainly "some evidence" that he possessed the knowledge necessary to function in the role of district representative. When there is evidence in the record showing that a district representative is adequately qualified to fulfill the position, the Parents have the burden to present evidence to the contrary. *A.D. v. NYC Dep't. of Educ.*, No. 12 Civ. 2673, 2013 WL 1155570, at \*7 (S.D.N.Y. Mar. 19, 2013). This they failed to do.

### 3. The recommended program and placement were not predetermined

■ The Parents' principal procedural challenge is that the DOE never had any intention of placing AB anywhere except in public school. The SRO rejected this challenge as well. The Court sees nothing with which to disagree.

The Parents are not arguing there was no process to the decisions the CSE made about AB's recommended program. As the SRO found, there is undisputed evidence in the record that the CSE considered several different public school programs before a 6:1:1 program was chosen, and that GB and AB's Rebecca teacher participated actively in the CSE meeting and contributed to the finalized IEP. (Tr. 79–80, 65–66, 75, 105). Rather, the Parents are arguing that it was predetermined that the placement given to AB would be at a public school, and that a private school was not considered by the CSE.

However, a CSE is obligated to recommend a placement that would be the "least restrictive environment" for the student. 20 U.S.C. § 1412(a)(5); *A.D.*, 2013 WL 1155570, at \*7. Therefore the issue in this case is not whether a private school placement would have been better for AB or would have provided him with more benefits; the issue is whether the 6:1:1 program would have provided some educational benefits to AB, in the least restrictive environment for AB. Once the CSE determined the 6:1:1 program was an appropriate program for AB, in that it provided him with educational benefits, it was not a procedural violation for the CSE to decline

to consider whether a more restrictive placement in a private school would provide more benefits to AB. *A.D.*, 2013 WL 1155570, at *8.

To the extent that the Parents complain that members of the CSE team came into the meeting having explored the options available in the public school, that is not "predetermination." "Predetermination is not synonymous with preparation." *Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir.2004); *see also FB v. N.Y.C. Dep't of Educ.*, 132 F.Supp.3d 522, 536, No. 14 Civ. 3902, 2015 WL 5564446, at *9 (S.D.N.Y. Sept. 21, 2015). "Consideration of possible recommendations for a student, prior to a CSE meeting is not prohibited as long as the CSE understands that changes may occur at the CSE meeting." (SRO Decision at 8). The DOE may "prepare reports and come with pre[-]formed opinions regarding the best course of action for the [student] as long as they are willing to listen to the parents and the parents have the opportunity to make objections and suggestions." *Dirocco v. Bd. of Educ.*, No. 11 Civ. 3897, 2013 WL 25959, at *18 (S.D.N.Y. Jan. 2, 2013). A key factor with regard to predetermination is whether the DOE had an "open mind" with regard to the student's IEP. *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir.2009).

The Parents also argue that their predetermination claims not only apply to the IEP and the program selected, but to the choice of AB's placement at Horan. But the CSE did not discuss a specific school placement for AB at the meeting, so there is no evidence that Horan had been preselected for 2012–2013, certainly the Parents identify none. Their speculation is due to the fact that the DOE had assigned AB to the same school on two previous occasions. (Tr. 427–428). Furthermore, the DOE is entitled to "select the specific school without the advice of the parents so long as it conforms to the program offered in the IEP." *R.E.*, 694 F.3d at 191–92.

### 4. The SRO properly declined to consider the "prior written notice" issue

Finally, the Parents argue that the DOE impeded their meaningful participation in planning AB's education by not providing them with the prescribed Prior Written Notice advising them of the factors it considered in drafting its plans for AB, why it took certain actions or refused to take other actions, and/or otherwise explaining its plans for AB.

This argument appears to hinge on the contention that AB's placement was predetermined, and that the DOE was required to tell this to Parents prior to the CSE meeting. But as the SRO properly found that the placement was not predetermined, this argument falls of its own weight. Second, the argument does not make any sense, because AB's placement is up for re-determination every year at the CSE meeting.

### B. Substantive Challenges

The IEP has been described as the "centerpiece of the IDEA system. *Murphy v. Arlington Cent. Sch. Dist.*, 297 F.3d 195,197 (2d Cir.2002). An IEP must contain: "(1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis,

whether instructional objectives are being achieved." *Viola v. Arlington Cent. Sch. Dist.*, 414 F.Supp.2d 366, 377 (S.D.N.Y. 2006) (internal quotations omitted), *citing* 20 U.S.C. § 1414(d)(4)(A)(i); 34 C.F.R. § 300.320(a)(1); *see also* 8 NYCRR § 200.4(d).

 A substantive challenge to an IEP asks a district court to evaluate whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. "[F]or an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce progress, not regression." *D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 598 (2d Cir.2005). In evaluating whether an IEP is likely to produce progress or regression, the district court "must examine the record for any objective evidence." *Walczak*, 142 F.3d at 130.

 "[I]n order for the district court to conduct an independent review of the sufficiency of an IEP under the IDEA that does not impermissibly meddle in state educational methodology, it must examine the record for objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan." *Gagliardo*, 489 F.3d at 113. "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim v. Rhinebeck Central Sch. Dist.*, 346 F.3d 377, 382 (2d Cir.2003). Indeed, an SRO's decision regarding "the substantive adequacy of an IEP" should be afforded heightened judicial deference, particularly when the court's review "is based entirely on the same evidence as that before the SRO." *M.H.*, 685 F.3d at 244.

### 1. The IEP adequately identified AB's present levels of performance

 The IEP indicates AB's instructional level for both reading and mathematics as second grade. (Def. Ex. 1.10). For AB's reading skills, the IEP indicates, based on the Rebecca Progress Report, that AB could "read and write words associated with preferred objects or people," and that he "needed help to make the connection of letter sounds to form words." (SRO Decision at 10). The IEP also states that AB could "read short passages and could illustrate an accurate picture of events he had experienced." (*Id.*). For AB's mathematic skills, the IEP indicates AB "needed to add and make change with his money consistent with the goals in [his] program at the Rebecca School which had a particular focus on math in relation to daily living." (*Id.*). The SRO concluded that the IEP accurately described AB's then-current level of academic achievement, and that the description of his abilities was consistent with the evaluative information that was available to the CSE team. (SRO Decision at 12).

The Parents challenge the SRO's finding, on the ground that nothing in the IEP reflected the "wide scatter" of AB's academic ability levels. They argue that, in some academic skill areas, AB exceeded the second grade range assigned by the DOE. For example, at the IHO hearing, the Rebecca School Program Director testified that some of AB's money skills were at a third to fifth grade level, and that his auditory processing abilities were anywhere from a sixth to eighth grade level. (Tr. 229–230). The IEP admittedly makes no mention of these different ability levels.

The issue is what information was before the CSE team when they came up with the IEP. Plainly the CSE had evidence of a second grade level of performance. Leone–Flick, testifying on behalf of

the DOE at the IHO hearing, said that the CSE determined AB's instructional level based on the information provided at the CSE meeting by the Rebecca teacher; she noted that Rebecca does not assign grade levels. (Tr. 44, 47–50). Confirming this testimony, AB's Rebecca teacher testified at the IHO hearing that, as of July 2012, (when the IEP would have been implemented), AB's reading skills were between a first and second grade level and his mathematics skills were at a second grade level. (Tr. 310–311). In short, there is no evidence that the IEP is misleading in this regard. The SRO carefully considered the information that was available to the CSE about AB's program at the time the IEP was created. Her decision deserves deference. *See J.M. v. New York City Dept. of Educ.*, No. 12 Civ. 8504, 2013 WL 5951436, at *20–21 (S.D.N.Y. Nov. 7, 2013).

### 2. The IEP properly addressed AB's sensory processing disorder and provided management strategies

The SRO concluded that the IEP incorporated the Rebecca School Progress Report and thus did describe AB's sensory needs appropriately. (SRO Decision at 11). The Parents challenge the SRO's finding on the ground that there is no detail about the "depth and breadth" of AB's sensory processing issues, and no indication that AB's response to becoming overwhelmed is to withdraw and become unavailable for learning.

The SRO's decision on this point also deserves deference. AB's sensory needs are noted in the IEP. For example, the "Management Needs" section of the IEP discussed AB's need for visual and verbal cues and sensory input and breaks. (Def. Ex. 1.2). The IEP also noted that AB had made significant improvements in his ability to attend various types of sensory input, although he remained sensitive to loud noises. (Def. Ex. 1.1–1.2). Finally, there were specific goals and short term objec-

tives related to addressing AB's "ability to uses sensory information to understand and effectively interact with people and objects in school and home environment." (Def. Ex. 1.4).

Whether there is enough detail in the goals and strategies of the IEP is "precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382. Every aspect of a student's specific educational issues does not need to be detailed in the IEP, as long as the IEP designed to specifically address those issues. *P.G. v. N.Y.C. Dep't of Educ.*, 959 F.Supp.2d 499, 512 (S.D.N.Y.2013). This IEP is so designed.

### 3. The annual goals included in the IEP were appropriate

The SRO concluded that that the eleven annual goals and forty short-term objectives contained in the IEP were appropriate as they were targeted to AB's needs and provided sufficient information to guide a future teacher in instructing AB. (SRO Decision at 14). The SRO also concluded the goals were appropriate, because all were (1) discussed at the CSE meeting, (2) reviewed and modified with the input of AB's Rebecca teacher, and (3) found by AB's teacher to be appropriate at the time of the CSE meeting. (SRO Decision at 13–14; Tr. 74–75, 77, 83, 108, 328–332).

The Parents challenge the SRO's finding. Noting that the goals were copied from AB's Rebecca Progress Report, they insist that the goals were too vague to be implemented in a public school that employed different pedagogical methods from Rebecca.

"An IEP must include a written statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from the student's disability...." (SRO Deci-

sion at 13)(*citing* 20 U.S.C. § 1414(d)(1)(A)(ii); 34 C.F.R. § 300.320(a)(2)(i); 8 NYCRR 200.4(d)(2)(iii)). Each annual goal must include a description of how the student's progress towards achieving each goal will be measured. (SRO Decision at 13)(*citing* 8 NYCRR § 200.4(d)(2)(iii)(b); 20 U.S.C. § 1414(d)(1)(A)(i)(III); 34 CFR 300.320(a)(3)).

"In this Circuit, courts are reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress.'" *L.O. v. N.Y.C. Dep't of Educ.*, 94 F.Supp.3d 530 (S.D.N.Y. 2015) (citing *P.K. v. N.Y.C. Dep't of Educ.*, 819 F.Supp.2d 90, 109 (E.D.N.Y.2011); *R.R. v. Scarsdale Union Free Sch. Dist.*, 615 F.Supp.2d 283, 295 (S.D.N.Y.2009)). "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382. Courts in this Circuit have also found that goals are not "per se inappropriate" simply because they were copied from a prior report. *See R.B. v. New York City Dept. of Educ.*, No. 12 Civ. 3763, 2013 WL 5438605, at *13 (S.D.N.Y. Sept. 27, 2013); *A.M. v. New York City Dept. of Educ.*, 964 F.Supp.2d 270, 284–285 (S.D.N.Y.2013).

The IEP unquestionably dictates adequate goals and objectives for AB. For example the annual goals call for AB to "improve the ability to use sensory information to understand and effectively interact with people and objects in school and home environments," and to "improve motor planning to enhance the quality of movement and efficient organization of self for effective participation in school and home activities." (Def. Ex. 1.4). Examples of the short-term objectives include requirements for AB to be able to "read aloud three new sight words a month" and that AB will be able to "follow a sequence

of three steps as part of a recipe" with "one redirection cue on 3 out of 4 opportunities." (Def. Ex. 1.3–1.4). There was also undisputed testimony that AB's teacher participated in the modification of these goals and found them appropriate. (Tr. 328–332). Since the SRO's decision and reasoning is supported by the record, her decision in this regard deserves deference.

### 4. AB did not need an FBA or BIP

The SRO concluded that, based on the evidence in the hearing record, AB did not require an FBA or BIP at the time of the CSE meeting, that the CSE properly considered special factors related to AB's behavior that impeded his learning, and that the IEP appropriately addressed the student's behavioral and sensory needs. (SRO Decision at 16).

The Parents challenge the SRO's finding on the ground that an FBA or BIP was necessary for AB because he has tendency to withdraw and shut down when he is overstimulated, which interferes with his learning. They assert that, absent one of these evaluations, AB's sensory processing disorder is insufficiently documented in the IEP.

Under New York regulations, a CSE must, "in the case of a student whose behavior impedes his or her learning or that of others, consider strategies, including positive behavioral interventions, and supports and other strategies to address that behavior." 8 NYCRR § 200.4(b)(3)(i). These strategies include an FBA, which is "the process of determining why a student engages in behaviors that impede learning and how the student's behavior relates to the environment." *Id.*, § 200.1(r). FBAs are conducted "as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." *Id.* § 200.4(b)(1)(v). An FBA must include an "identification of the problem behavior" and "the formula-

tion of a hypothesis regarding the general conditions under which [the] behavior usually occurs." *Id.* § 200.1(r). Where the student's behavior impedes his learning or that of his peers, the CSE should create a BIP that sets out "intervention strategies to be used to alter antecedent events to prevent the occurrence of the behavior, teach individual alternative and adaptive behaviors to the student, and provide consequences for the targeted inappropriate behavior(s) and alternative acceptable behavior(s)." *Id.* § 200.22(b)(4)(ii).

Notwithstanding those requirements, the case law is clear that "a failure to conduct an FBA . . . does not rise to the level of a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at 190; *see also A.C.*, 553 F.3d at 172 (failure to perform FBA did not render IEP legally inadequate in light of IEP's provision of strategies to address child's behavior); *T.Y.*, 584 F.3d at 419 ("substantial evidence in the record" of ways to address problematic behaviors provided basis for SRO to conclude that, despite failure to conduct a FBA or a BIP, a FAPE was not denied).

Applying these standards to the evidence in the hearing record, the SRO's finding on this issue is again deserving of deference. Although there was evidence presented that AB has the tendency to withdraw when he becomes overstimulated, there was no evidence in the record that AB engages in the types of disruptive behavior that require an FBA or BIP. For example, in *N.S. v. New York City Dep't of Educ.*, No. 13–CV–7819 VEC, 2014 WL 2722967, at *8 (S.D.N.Y. June 16, 2014), the student exhibited the maladaptive behaviors of dropping to the floor, throwing or dropping items, and putting her hands or objects in her mouth in order to avoid doing work. The district was required to perform a BIP for her. In

*J.S. v. New York City Dep't of Educ.*, 104 F.Supp.3d 392, 406, No. 14 CIV. 4315 PAE, 2015 WL 2167970, at *11 (S.D.N.Y. May 6, 2015), by contrast, where the student suffered from "anxiety, low energy, low motivation, and frustration," the Court found there was not enough evidence presented to show the student engaged in behaviors that impeded his learning or that of others.

It bears repeating that neither GB nor AB's Rebecca teacher suggested an FBA or BIP was necessary at the CSE meeting; and AB's Rebecca teacher expressly testified at the IHO hearing that AB exhibited no behavior requiring an FBA or BIP. (Tr. 71–72, 323–325). Where there is no evidence that a student's behavior interfered with his or another student's ability to learn, the CSE is not required to conduct an FBA or BIP. *See J.S. v. New York City Dept. of Educ.*, 104 F.Supp.3d 392, 405–06, No. 14 Civ. 4315, 2015 WL 2167970, at *11 (S.D.N.Y. May 6, 2015).

### 5. AB's medical issues and their implications

There is one area in which the SRO's decision is manifestly erroneous: her treatment of the IEP's description of AB's medical issues. Here I conclude that the IEP is in fact deficient. As a result, the IEP denied AB a FAPE.

It is undisputed that AB has numerous serious medical conditions. The SRO concluded that the IEP was not deficient because it described his medical needs consistent with the information available to the CSE. (SRO Decision at 12). To the extent that the Parents allege that this description is insufficient and not consistent with the evaluative information available to the CSE, the SRO concluded that GB had not provided the CSE with the information about AB's health issues that she now contends is missing from the IEP. (*Id.*).

The IEP certainly does mention some of AB's health issues: PANDAS, seizure disorder, food allergies, and the need for special transportation accommodations. (Def. Ex. 1). However, the IEP unquestionably discusses the most important of these issues as though they were in the past. In particular, the IEP notes that AB has not had a seizure in several years, and no longer takes antibiotics to treat PANDAS. (*Id.* at 1.1–1.2). It mentions his need for special transportation accommodations and services but does not mention that the bus needs to be climate controlled, and does not mention anything about the boy's need to be in a climate controlled school because he is at risk of having a seizure when he becomes overheated or dehydrated. (Def. Ex. 1). The IEP does not set out any sort of "medical alerts" of which AB's teachers should be aware.

The SRO's conclusion that the IEP adequately addressed AB's medical needs is not supported by the record. I note that the SRO's decision in this regard is not entitled to particular deference, since the issue concerns the boy's medical needs, not educational issues (as to which this court generally defers to the SRO's greater expertise).

The SRO downplayed the seriousness of AB's medical conditions by noting that the two most serious—PANDAS and the seizure disorder—appeared to have been brought under control. From the Parents' perspective, of course, AB's progress on these fronts occurred precisely because the staff at Rebecca kept him hydrated and in a climate controlled environment at all times, thereby reducing the risk that he would suffer another seizure. The staff at Rebecca also kept a careful watch on AB's exposure to strep in the classroom, so the boy could be monitored for PANDAS. The IEP does not appear to have taken the staff's vigilance into account when discussing AB's medical situation, because it contains no instructions for the public school staff about the need to control AB's environment, keep him hydrated, and reduce the risk of exposing him to strep in the classroom. The absence of any specific procedures for monitoring his health issues, the Parents argue, exposes their son to precisely the type of risk that was carefully avoided at Rebecca.

The Parents further point to the fact that AB was assigned to Horan—a school that has no air conditioning in the hallways, cafeteria, and auditorium—as proof that the IEP is deficient in this regard. The Court finds that singular piece of evidence highly persuasive.

Also persuasive of the inadequacy of the SRO's findings on AB's health is her conclusion the CSE was not apprised of other health issues by the Parents. That assertion is contradicted by the record, which shows that the Parents provided the CSE with considerable documentation about his health issues. The Parents gave the DOE a letter from AB's neurologist discussing his seizures and the need to ride to school in a climate controlled bus and with his ride lasting no more than 30 minutes; a letter from his developmental pediatrician discussing his autism, seizure disorder and PANDAS; and a request for medical accommodations completed by his developmental pediatrician, which notes that AB must not be exposed to extreme temperatures and requires constant adult supervision. (Pl. Ex. N). The information provided to the DOE also included a HIPPA release, which permitted the CSE to obtain any and all medical information from the boy's doctors needed to reach a conclusion about his medical requirements. GB testified at length before the IHO about the boy's medical needs, although there is no contention that all the information she

gave the IHO was given *in haec verba* to the CSE.

That the deficiencies in the IEP concerning AB's health requirements deny him a FAPE is manifest. If AB begins to suffer from seizures again, or develops PANDAS symptoms, that will constitute regression, not a progression, in his educational attainment. The uncontradicted evidence in the record shows that the boy is at serious risk for both if he is not placed in a controlled environment and carefully monitored. Since the IEP makes no provision for doing either, it denies him a FAPE.

### C. Challenges to the Proposed Placement

The SRO concluded that the Parents could not prevail on their challenge to the assigned public school's ability to implement the IEP because their claims were impermissibly speculative, since AB did not enroll at Horan. (SRO Decision at 23). The SRO cited *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012), and concluded that "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." The SRO also stated that the appropriate inquiry for Parents in unilateral placement cases is into "the nature of the program actually offered in the written plan [IEP], not a retrospective assessment of how that plan would have been executed." *K.L. v. New York City Dept. of Educ.*, 530 Fed.Appx. 81, 87 (2d Cir.2013)(internal citations omitted). "[T]he appropriate forum for [a claim the IEP was not implemented] is a 'later proceeding' to show that the child was denied a [FAPE] 'because necessary services included in the IEP were not provided in practice.'" *F.L. v. New York City Dept. of Educ.*, 553 Fed.Appx. 2, 9 (2d Cir.2014) (quoting *R.E.*, 694 F.3d at 187 n. 3). Therefore the SRO found that because the Parents rejected the assigned public school cite and placed AB in a nonpublic school prior to the time the DOE was required to implement the IEP, the arguments raised by the Parents about the proposed placement were speculative. (SRO Decision at 22). As a result she did not address them. (SRO Decision at 22).

The Parents challenge the SRO finding on the grounds that Horan is inappropriate because the IEP could actually not have been implemented at Horan and (2) AB has significant educational, sensory and medical needs that are incompatible with Horan, most significantly, that he needs to be in a climate controlled environment and Horan is not air conditioned.

■ The SRO's decision on this issue merits no deference. School districts do not have "carte blanche" to assign a child to a school "that cannot satisfy the IEP's requirements." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir.2009).

The short answer here is that the parents are correct about the placement for the same reason they were correct about the IEP: Horan was an improper placement because significant areas of the school—including the gym and the cafeteria—were not climate controlled and became quite hot, especially during the summer months (recall that AB's placement was a 12 month a year placement).

A recent decision by the Second Circuit has clarified this issue of determining the propriety of a placement. In *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 244 (2d Cir.2015), the Court drew a distinction between deciding that a placement was inappropriate because "a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates ..." and finding that the placement was inappropriate because "a proposed school lacks the services required by the IEP." Reaching the former conclusion is "speculative" when the stu-

dent has not enrolled in the school; reaching the latter conclusion is not.

The Court provided some examples of when it is not speculative to decide a proposed placement is inappropriate. For example, it was not speculative to conclude that an IEP recommending a seafood-free environment for a child with a life threatening seafood allergy could not be implemented at a school that was not seafood free. So a student assigned to attend this school was denied a FAPE. See D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ., 950 F.Supp.2d 494, 513 (S.D.N.Y.2013). Similarly, it was not speculative to conclude that an IEP recommending one-on-one occupational therapy outside of the classroom could not be implemented at a school that provided only in-class occupational therapy in a group setting. See B.R. ex rel. K.O. v. New York City Dep't of Educ., 910 F.Supp.2d 670, 676–679 (S.D.N.Y. 2012).

The SRO concluded that R.E. foreclosed the parents' challenge to AB's placement at Horan because the boy never enrolled at the school, so its ability to comply with the IEP was speculative. However, the SRO misconstrued the nature of the parents' challenge, a least insofar as it concerns their son's medical condition; they argue that Horan was inappropriate because important areas within the school were not air conditioned, thereby placing their son at great medical risk. Put otherwise, they argue that Horan lacks the ability to provide what the IEP calls for (or, in this case, what the IEP should have called for but did not). R.E., on which the SRO relies, does not hold that such a challenge is foreclosed unless the parents send their child to a facially deficient placement school. The SRO simply misapplied the law when she refused to consider this challenge (although her decision not to do so was understandable, since she did not find

the IEP to be deficient in this or any regard).

The Parents also argue that the IEP could not be implemented at Horan because: (1) Horan did not have a sensory gym, which is mentioned in a short-term objective in the IEP, (2) several goals in the IEP relate to Rebecca's transitions program, which does not exist at Horan, and (3) many of the goals in the IEP relate to the teaching methodology offered at Rebecca which is not offered at Horan. Even though the medical issue is dispositive, I will address these issues in the interest of completeness.

The first challenge the Parents raise is that one of AB's short-term occupational therapy objectives requires him to locate "3–5 motivating objects in a sensory gym." They assert there is no "sensory gym" at Horan. (Def. Ex. 1.5). Instead, GB observed on her visit to Horan that the school conducts occupational therapy sessions for students in a classroom with desks on the perimeter, a mat on the table, and a small mat in the corner of the room. (Pl. Ex. R–1).

This challenge by the Parents requires the Court to draw a fact-based conclusion in a sensitive educational area—namely, whether a proposed placement has appropriate facilities and sensory equipment—which the Court is poorly positioned to do. FB and EB v. New York City Department of Education, 132 F.Supp.3d 522, 2015 WL 5564446 (S.D.N.Y. Sept. 21, 2015). The Parents never define what a "sensory gym" is, and the Parents have not provided evidence that the goal of "locating 3–5 motivating objects" could not be done in the area at Horan set aside for occupational therapy. There is simply not enough evidence to find that this objective in the IEP could not be implemented at Horan.

The second challenge the Parents raise is that several goals in the IEP relate

specifically to Rebecca's transitions program, which has no counterpart at Horan. For example, the transition program goals in the IEP include that AB should "when in the community . . . present a cashier with the correct dollar denomination" and "navigate safely through the community by scanning for cars with minimal prompting by an adult." (Def. Ex. 1.3). This is the type of challenge foreclosed by *R.E.*—a challenge to whether Horan will give AB the opportunity to take on these transitional goals. The Parents admit that Horan students take trips into the community at least once a week. (Pl Ex. R–2). Horan staff could obviously use these trips to work on AB's stated transitional goals. Since AB was never enrolled at Horan, it is purely speculative that the staff will not do precisely that. *R.E.*, 694 F.3d at 175; *K.L.*, 530 Fed.Appx. at 87.

As to the parents' third challenge: in *FB and EB v. New York City Department of Education*, 132 F.Supp.3d 522, 2015 WL 5564446 (S.D.N.Y. Sept. 21, 2015), my colleague Judge Engelmayer ruled on a virtually identical issue. The student in *FB*, like AB, attended Rebecca, and goals in the IEP were copied directly from a Rebecca progress report. The Parents argued that the IEP could not be implemented at the DOE placement. Judge Engelmayer deemed the public school placement inappropriate and denied the student a FAPE because there were three ways that the IEP could not be implemented at the proposed placement. *FB*, 132 F.Supp.3d at 552–53, 2015 WL 5564446, at *26. One of three ways the proposed placement was deficient was that the IEP contained goals which adopted the DIR teaching methodology (the method used at Rebecca), which was not used at the proposed placement school, *Id.* at 550–51, at *24. Judge Engelmayer found that four of the IEP's seventeen annual goals, as well as a number of the short-term objectives, overtly required the use of DIR

terminology. When the CSE chose these goals and objectives, it embraced and implicitly intended the student to be taught using this methodology. *Id.* The proposed placement did not use this methodology; indeed, the teacher who would have taught the student said she did not understand these goals. Judge Engelmayer concluded that the proposed placement was incapable of implementing these goals. *Id.* He also concluded that the proposed placement was unable to provide the five sessions a week of occupational and speech and language therapy required by the IEP because the therapists were only at the school two days a week, or provide a quiet environment for the student, which was also required by the IEP. *Id.* at 552–53, at *26.

In this case, it is undisputed that Horan does not use the DIR methodology. Although the IEP itself doesn't mention the DIR methodology, five of the forty short-term objectives use the term "circles of communication," which is DIR terminology. (Def. Ex. 1; Tr. 208–209, 368–370). Therefore it is fair to say that, in this respect, several of the short-term objectives could not be implemented at Horan—at least, not as stated. In contrast to the *FB* case, none of the annual goals themselves make use of DIR terminology. (Def. Ex. 1).

If the use of DIR–type terminology in 5 of AB's 40 short term goals were the only deficiency in the IEP, this court would not conclude that the IEP denied AB a FAPE. However, as AB cannot be reliably kept in a climate controlled environment at Horan, it is already the case that the placement is inappropriate; the CSE's adoption of DIR–focused goals for AB simply exacerbates the problem with the placement.

**Prong 2: Rebecca Was an Appropriate Placement**

As previously discussed, the second prong of the *Burlington–Carter* test is

whether the alternative placement chosen by the Parents is appropriate to meet the child's needs. The IHO concluded that Rebecca offered and provided an educational program which met AB's educational needs and was reasonably calculated to enable AB to receive educational benefits. (IHO Decision at 40). The DOE did not appeal the IHO's decision to the SRO, and there appears to be no dispute that Rebecca is an appropriate placement. The Parents have met their burden. (Def. Br. 13).

Therefore this Court upholds the decision of the IHO, and concludes that Rebecca was appropriate.

## IX. Prong 3: The Equities Favor the Parents

At the third and final step of the *Burlington–Carter* test, "courts are required to evaluate the equities in considering a tuition reimbursement claim." *M.H.*, 685 F.3d at 254 (citing *Carter*, 510 U.S. at 12, 114 S.Ct. 361); see generally 20 U.S.C. § 1415(i)(2) (authorizing court, where IDEA violation is found, to "grant such relief as the court determines is appropriate"). "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." *Carter*, 510 U.S. at 16, 114 S.Ct. 361; see also *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F.Supp.2d 635, 671 (S.D.N.Y.2011) ("[T]his Court has broad discretion to consider the range of all relevant facts in determining whether and to what extent awarding relief is equitable.").

Courts have considered a variety of factors at this step, including whether the parents cooperated with the CSE (e.g., providing reports, attending the meeting, participating in the meeting), *M.H.*, 685 F.3d at 254; whether the parents timely notified the school district of their intent to place their child in a private school, *see, e.g., Frank G.*, 459 F.3d at 376; whether the parents visited the DOE's proposed placement, *see, e.g., Mr. & Mrs. A. v. N.Y.C. Dep't of Educ.*, 769 F.Supp.2d 403, 419 (S.D.N.Y.2011); whether the parents intended to genuinely consider a proposed public placement, or whether they would have kept their child in private school regardless of the proposed public placement, *see, e.g., Carmel Cent. Sch. Dist. v. V.P.*, 373 F.Supp.2d 402, 418 (S.D.N.Y.2005); whether the parents or the DOE unreasonably delayed anything, *see id.* at 416; and the appropriateness of the DOE's conduct (for example, in one case, the court found that the DOE had "consistently stonewalled M.H.'s inquiries into the appropriateness" of the school, *M.H.*, 685 F.3d at 254 (citation omitted)).

Neither the SRO nor the DOE discussed this aspect of the *Burlington–Carter* test because they determined the program offered in the IEP was appropriate. The IHO, however, found that the equities favored the Parents and awarded them tuition reimbursement in the form described above. (IHO Decision at 41–42). The IHO specifically noted that: the Parents communicated with the CSE, attended meetings as requested, met all DOE requests, and visited the proposed placement; while the DOE failed to respond to any parent notice or request for additional information, and failed to address any concerns raised by GB's correspondences regarding the IEP and placement; and that GB even facilitated the delivery of the IEP by picking it up from the DOE herself. (*Id.* at 41).

While the IHO's opinion on the equities is not entitled to deference, it is highly persuasive. *C.F. ex rel. R.F. v.*

*New York City Dept. of Educ.*, 746 F.3d 68, 77 (2d Cir.2014). On this record, the IHO's assessment of the equities is unavoidably correct. The Parents cooperated with the DOE at all times; they repeatedly wrote letters voicing their concerns with the IEP and proposed placement; they immediately contacted the DOE and Horan to schedule a visit after they received the FNR; they visited the DOE's proposed placement; they provided timely notice of their intent to privately place AB; and while they obviously preferred Rebecca, there was evidence that they would have sent AB to a public school if an appropriate IEP and placement were provided. (Tr. 426). More generally, the Parents consistently acted reasonably and promptly. By contrast, the DOE ignored several reasonable letters from the Parents voicing their concerns, and failed to schedule a school visit until after the start of the new school year.

Under these circumstances, the equities favor the Parents.

## CONCLUSION

For the foregoing reasons, the Court grants the Parents' motion for summary judgment, orders the DOE to fully reimburse the Parents for the cost of tuition at the Rebecca School for 2012–2013 (i.e. $97,700), and denies the DOE's cross-motion for summary judgment. The Clerk of the Court is directed to remove Docket Nos. 15 and 17 from the Court's list of pending motions and to close the file.